[No. D061155. Fourth Dist., Div. One. June 22, 2012.]

In re LANA S. et al., Persons Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
C.G., Defendant and Appellant.

## COUNSEL

Neil R. Trop, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Gary C. Seiser, Deputy County Counsel, for Plaintiff and Respondent.

Benjamin Brueseke, under appointment by the Court of Appeal, for Minors.

OPINION

**McCONNELL, P. J.**—We affirm judgments in which the court assumed jurisdiction over C.G.'s children, Lana S. and Landon S., based on C.G.'s drug use and the presence of drug paraphernalia in the home; removed them from her custody; and denied her reunification services. Contrary to C.G.'s contention, the court's jurisdictional and dispositional findings, and the denial of reunification services, are supported by substantial evidence.

A preliminary issue on the denial of reunification services is a matter of statutory construction. Under Welfare and Institutions Code section 361.5, subdivision (b)(10) and (11),[1] a parent is not entitled to services if the juvenile court finds by clear and convincing evidence that in a prior dependency case the parent failed to reunify with a sibling or half sibling of the child in the current proceeding, and "has not subsequently made a reasonable effort to treat the *problems that led to removal*" of the sibling or half sibling. (*Id.*, subd. (b)(11), italics added.) The issue is whether the italicized language refers only to the problems alleged in the prior dependency petitions, physical abuse and domestic violence, or extends to a chronic problem addressed as a substantial component of C.G.'s service plan, drug abuse.

To avoid an absurd result, we interpret the language in the latter manner. The exceptions to the general mandate of services are intended to protect a child's best interests, and secondarily to preserve limited governmental resources, by not requiring services when doing so would be fruitless.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Prior Proceedings*

C.G. has a lengthy history of drug abuse and child protective services (CPS) intervention. In 2003 the San Diego County Health and Human Services Agency (the Agency) took her eldest son, Joshua G., into protective custody at birth because they both tested positive for methamphetamines. She admitted a history of drug abuse and drug use during the pregnancy. She participated in reunification services, including a drug treatment program, and reunified with him in 2005.

Later in 2005, however, the Agency again took Joshua into protective custody, along with C.G.'s eldest daughter, S.G., because of the physical abuse of Joshua. C.G. originally confessed to harming him, but after she was arrested she recanted and blamed her live-in boyfriend, Shawn B. In

---

[1] Further statutory references are to the Welfare and Institutions Code.

2006, C.G. gave birth to Shawn G., whose alleged father was Shawn B. Shawn G. was taken into protective custody because of a domestic violence incident between C.G. and Shawn B. C.G. admitted to the social worker that she was involved in "several domestic violence incidents in the past."

The Agency's detention report in this case states that in the prior proceedings, C.G.'s service plan required her to "[reenroll] in individual therapy, participate in an in-home parenting education program, and maintain regular visitation with the children. At some point, she was also required to complete a second psychological exam, continue in individual therapy, domestic violence classes, and substance abuse testing."

The report also states: "Throughout the duration of her [second dependency] case, there were concerns that [C.G.] was using drugs, as evidenced by her pattern of no-shows when asked to submit to random drug tests, showing up to the drug[-]testing site and reporting that she could not produce a urine sample, or showing up to drug test at times not designated by the social worker. In November of 2006, [C.G.] tested positive for methamphetamine and since that time she failed to complete drug tests for SARMS [(Substance Abuse Recovery Management System program)]."

The report adds: "Throughout the duration of her second dependency case, [C.G.] was asked to submit to random drug testing as part of her case plan." Further, C.G. "was asked to enroll in in-patient drug treatment [but] she refused. [She] continued to deny her drug use and therefore failed to adequately address and remedy her drug issues. . . . [She] failed to acknowledge and/or take responsibility for addressing her drug issues, *which appeared to contribute to her inability to maintain a safe home for her children.*" (Italics added.)

A November 2006 psychological evaluation of C.G. states she revealed that in the earlier proceeding for Joshua she "was kicked out" of KIVA, a residential drug treatment program (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1397 [81 Cal.Rptr.3d 747]), "because she would not complete the work assignments she was given." The report states that in psychological testing, C.G. exhibited a "profile . . . similar to that found in individuals who have proven vulnerable to difficulty in managing alcohol and any drugs give them an immediate relief from tension." The report also states that since C.G. had not developed "many life coping skills that enable her to deal well with stress," she "remains vulnerable for substance abuse."

In the summer of 2007, C.G.'s reunification services and parental rights over the three children were terminated. She appealed and this court affirmed the judgments. (*In re Joshua G.* (Apr. 11, 2008, D051499 [nonpub. opn.].) The children were ultimately adopted.

B.   *Current Proceeding*

Lana was born to C.G. in the fall of 2007, and Landon was born to her in 2009. C.G. and the children's presumed father, Michael S., separated in 2011.

In August 2011 C.G.'s boyfriend, Justin D., was living with her and the children. On August 15, police officers went to the home on a domestic violence call. C.G. said she and Justin were just arguing. She quickly walked toward her bedroom in the back of the apartment, but officers stopped her. She became confrontational and yelled. In plain view, and within the children's reach, the officers found drug paraphernalia in the bedroom, including glass pipes, burnt foil, a burnt tablespoon and a blowtorch. They found more glass pipes and a "compressed pellet gun" inside an open drawer.

C.G. denied drug use, but Justin reported she used heroin and methamphetamines, and she last used methamphetamines the previous night. The home was foul smelling and filthy, with "piles of dirty clothing, trash, and rotten food thrown throughout the living room," and "animal feces and urine on the floors." C.G., however, did not feel the home was unfit for the children, who were also filthy. C.G. was arrested for possession of drug paraphernalia, obstruction of justice and child cruelty.

C.G. was released on bail, and on August 17, a social worker, accompanied by police officers, made an unannounced visit to her home. The social worker checked C.G.'s bedroom and saw a glass bong on top of a dresser in the open closet. C.G. denied any drug use since she was a teenager, despite evidence to the contrary in the prior dependency proceedings. She vehemently refused to voluntarily drug test. C.G. reported that the children had been in the care of their maternal grandmother since August 15, but C.G. gave the social worker a false address for the grandmother. After a brief period, C.G. ordered the social worker and officers to leave.

On August 24, when the children were located, the Agency took them into protective custody and filed petitions on their behalf under section 300, subdivision (b). Both children tested presumptively positive for methamphetamines, but confirmatory testing was negative. Medical personnel explained to the social worker that cutoff levels for an initial screening are lower and detect exposure through any factors, including environmental exposure. That amount, however, may "not be high enough to produce a confirmatory positive."

C.G. told the social worker that when police officers arrived at her home on August 15, she had just returned from a two-week vacation to Washington State. She said she could produce evidence of the trip, such as gas receipts, in

court. She let a friend of Justin's stay at her home during her absence, and she surmised he threw a party, trashed the place and left the drug paraphernalia behind. C.G. again refused to voluntarily drug test. She also refused other voluntary services. She "did not give a sober date and stated that she [was] in treatment before but it did not work for her. [She] said that being around other[s] that use and have a problem doesn't help her. [She] did not give any specific information on the substance abuse program she participated in or the dates of enrollment."

In its jurisdictional and dispositional report, the Agency recommended the denial of services to C.G. because, among other things, she "[failed] to reunify with [three] older children [who] were removed due to the mother's . . . substance abuse . . . ." The report also states that on September 12, 2011, C.G.'s phone accidentally called the social worker's phone. On C.G.'s phone, the social worker overheard a conversation taking place between C.G. and Justin. The report states the following "is a summary of concerning statements" between them:[2]

"Justin: Where is the mouse? Car sounds . . . continuous beeping

"[C.G.]: I don't fucking know. Move away from me.

"Justin: Where is the mouse? I need the mouse Give me the mouse

"[C.G.]: You can't wait for five fucking minutes? Give me the shit that's mine. I'll give it to you after me. Unzipping sounds. . .

"Justin: No I paid. That's was mine. It's was all my shit.

"[C.G.]: You're a fucking punk. You steal from me all the time. It's my shit, 60.00 dollars is yours the rest of it is mine. 60 dollars is what you get. That's my hook up you fucking prick. Hell no. You're not married. I'm not married to you.

"Justin: Exactly, so you ain't getting half of mine. I'm going to tell my grandma you took it.

"[C.G.]: Then I'm going to tell your grandma you're a fucking heroin addict. . . . You're going to use my shit so you can sell it to your brother so you can get a fucking computer. Bye I'm calling your grandma."

---

[2] Except for using C.G.'s protective initials rather than her name, we repeat the report's language verbatim. We do not point out or correct any errors in grammar or punctuation, but we do omit italics and boldface type.

In an addendum report, the social worker explained C.G. was provided with referrals for a parenting class and a drug abuse assessment and "strongly encouraged" to voluntarily participate. She did not attend and showed no interest in those services or any type of drug treatment. Further, she was asked to submit to on-demand drug testing four times, but she did not show up.

The contested hearing was held in December 2011. The social worker testified she made "a variety of attempts to offer voluntary services" to C.G., and encouraged her to participate, but she refused. The social worker also testified C.G. never provided any proof of a trip to Washington. As to the recommendation of no services for C.G., the social worker explained: "The main concern . . . is the fact that mother is in denial of substance abuse history and use. It's a huge concern because if a parent denies having any problems, then they will not often seek any treatment, and she has been very resistant to doing any type of services. And if we had seen that she had been participating in voluntary services, then we certainly would have reexamined our position in giving the mother services. But at this point, . . . other than visitation, [she] has not been willing to do an assessment or address any of the concerns that we have."

The social worker clarified that C.G. said she would participate in services if they were court ordered. In the social worker's view, however, it was unlikely that a parent who refused voluntary services would participate in court-ordered services.

C.G. testified she had given receipts from her Washington trip to her former attorney and was unable to retrieve them. She explained she refused voluntary services "[b]ecause in the past, I have completed services, and I completed everything, and the outcome was still the same." She said she would participate in court-ordered services to get her children back. C.G. claimed the last time she smoked methamphetamine was in 2003, and her test in 2006 was not positive, but presumptively positive because she did not show up. As to the phone conversation between her and Justin, C.G. testified they were talking about a computer mouse, not drugs.

The court assumed jurisdiction over the children and placed them with paternal relatives. It ordered services for Michael and no services for C.G.

## DISCUSSION[3]

### I

### *Jurisdictional Finding*

■ C.G. challenges the court's jurisdictional finding. " ' "A dependency proceeding under section 300 is essentially a bifurcated proceeding." [Citation.] First, the court must determine whether the minor is within any of the descriptions set out in section 300 and therefore subject to its jurisdiction.' [Citation.] ' "The petitioner in a dependency proceeding must prove by a preponderance of the evidence that the child who is the subject of a petition comes under the juvenile court's jurisdiction." ' [Citation.] 'The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm.' " (*In re A.S.* (2011) 202 Cal.App.4th 237, 243–244 [134 Cal.Rptr.3d 664].)

Here, the juvenile court assumed jurisdiction under subdivision (b) of section 300. " 'Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness,' " as a result of the parent's failure or inability to adequately supervise or protect the child. (*In re A.S., supra*, 202 Cal.App.4th at p. 244; see § 300, subd. (b).)

A substantial evidence standard of review applies. (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022 [104 Cal.Rptr.3d 478].) We review the entire record to determine whether substantial evidence supports the court's finding. We resolve all conflicts, and draw all reasonable inferences in support of the findings. (*Ibid.*) "We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts. The appellant has the burden to demonstrate there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 135–136 [140 Cal.Rptr.3d 222].)

"Substantial evidence does not mean *any* evidence; it must be ' " 'substantial' proof of the essentials which the law requires." ' [Citation.] 'To be sufficient to sustain a juvenile dependency petition[,] the evidence must be " 'reasonable, credible, and of solid value' " such that the court reasonably could find the child to be a dependent of the court by clear and convincing evidence.' [Citation.] A mere 'scintilla' of evidence is not enough." (*In re B.T.* (2011) 193 Cal.App.4th 685, 691 [122 Cal.Rptr.3d 651].)

---

[3] The children's trial counsel agreed with the Agency's position, as does their appellate counsel.

Count 1 of the petition alleged C.G. has a history of drug abuse and she used narcotics on August 14, 2011. C.G. asserts the evidence was insufficient on this count because Justin's statement to a police officer that she used methamphetamines was uncorroborated and not credible. When he made the statement, she had just returned from a trip to Washington to find her home in disarray. She was angry with Justin because his friend had been staying there, and a fight had ensued. C.G. argues his statement "had to be considered, as likely as not, a way to get even with [her]."

Count 3 of the petition alleged that on August 15, 2011, police officers found drug paraphernalia in C.G.'s home and within the reach of the children.[4] C.G. claims the evidence was insufficient on this count, because "the evidence was uncontroverted" that when officers found the paraphernalia she had just returned from Washington. Thus, she lacked knowledge of its existence.

The court, however, expressly found C.G.'s testimony not credible. Further, she submitted no gas receipts or other corroborating evidence of a trip to Washington. On September 2, 2011, Michael told the social worker he did not believe the drug paraphernalia belonged to C.G., and she "let a friend watch her home while [she] and [the] children were on vacation." The court, however, was presumably not swayed by Michael's unsupported opinion. Further, the police report does not indicate C.G. mentioned the Washington trip to officers on August 15 when they found the drug paraphernalia, which is notable since she would naturally be trying to avoid arrest.

C.G. essentially asks us to reweigh the evidence and credibility of the witnesses, which we may not do. Further, she cites no authority for the proposition that to be believed Justin's accusation had to be corroborated. To the contrary, " '[t]he testimony of a single witness is sufficient to uphold a judgment.' " (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1148 [106 Cal.Rptr.3d 382].)

Moreover, the evidence shows C.G. has a lengthy history of drug abuse. Her oldest son was removed from her custody in 2003 because of drug abuse, and she underwent drug treatment and reunified with him. In late 2006, however, she either tested positive for drugs or failed to show up for the test.[5] When the social worker met with her on August 17, 2011, she refused to voluntarily drug test. Additionally, on August 24, the children tested presumptively positive for exposure to methamphetamines, the drug Justin accused her of using on August 14. Further, the court could reasonably infer from the

---

[4] Count 2 of the petition was dismissed after trial.

[5] C.G. concedes that "a failure to comply with a court[-]ordered drug test is rightfully looked upon as a positive test . . . ."

overheard phone conversation between C.G. and Justin, they were arguing over drugs rather than a computer mouse. These various factors give credence to Justin's statement.

C.G. also asserts the children were not at risk of serious physical harm. She points out that the children's presumptively positive tests for methamphetamines "could be explained by any environmental exposure." The court, however, could reasonably find C.G. used methamphetamine at home on August 14, which exposed the children to the drug. Even if she did not use the drug herself that day, the young children were in her control and, on August 15, drug paraphernalia was found in the home, indicating someone had recently used drugs. Again, the court did not believe C.G.'s story that she and the children had just returned from Washington. Substantial evidence supports the court's jurisdictional finding.

## II

### *Dispositional Finding*

Additionally, C.G. challenges the court's dispositional finding. " 'After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing. [Citation.] At the dispositional hearing, the court must decide where the child will live while under the court's supervision.' [Citation.] 'A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." [Citation.] The court may consider a parent's past conduct as well as present circumstances.' " (*In re A.S., supra,* 202 Cal.App.4th at p. 247.)

" 'Before the court issues a removal order, it must find the child's welfare requires removal because of a substantial danger, or risk of danger, to the child's physical health if he or she is returned home, and there are no reasonable alternatives to protect the child.' " (*In re A.S., supra,* 202 Cal.App.4th at p. 247; see § 361, subd. (c)(1).) "Whether the conditions in the home present a risk of harm to the child is a factual issue." (*In re N.M.* (2011) 197 Cal.App.4th 159, 170 [137 Cal.Rptr.3d 424].) The court's dispositional finding is also subject to a sufficiency of the evidence standard of review. (*Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1078 [117 Cal.Rptr.2d 670].)

Substantial evidence also supports the court's dispositional finding. Given C.G.'s lengthy history of drug abuse, denial of any drug problem,

refusal to voluntarily drug test and enter drug treatment, and her reference to her live-in boyfriend as a heroin addict, the court could reasonably determine there was no alternative to removal. Further, the drug paraphernalia was found within the reach of the children. The police report states "the glass pipe and burnt foil and other sharp objects" were found on a two-foot-high nightstand by C.G.'s bed. C.G. contends removal was improper because there was no reliable evidence she used drugs on August 14, 2011. As discussed, however, the evidence supports a finding of drug use.

### III

### *Denial of Reunification Services*

### A

### 1

■ C.G. also challenges the court's denial of reunification services. On removal of a child from parental custody, the juvenile court generally must order reunification services to assist the parent to rectify the problems that led to removal. (§ 361.5, subd. (a); *In re Allison J.* (2010) 190 Cal.App.4th 1106, 1112 [118 Cal.Rptr.3d 856].) "This requirement implements the law's strong preference for maintaining the family relationship if at all possible." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474 [73 Cal.Rptr.2d 793].) Section 361.5, subdivision (b), however, sets forth certain narrowly specified exceptions—referred to as "reunification bypass provisions"—to the general mandate of services. The exceptions are subject to a clear and convincing standard of proof. (*In re Allison J.*, at p. 1112; *In re Baby Boy H.*, at p. 474.)

Section 361.5, subdivision (b) " 'reflects the Legislature's desire to provide services . . . only where those services will facilitate the return of children to parental custody.' [Citations.] When the court determines a bypass provision applies, the general rule favoring reunification is replaced with a legislative presumption that reunification services would be ' "an unwise use of governmental resources." ' " (*In re Allison J., supra,* 190 Cal.App.4th at p. 1112.) The statute " 'is related to that of the juvenile law itself—to ensure the well-being of children whose parents are unable or incapable of caring for them by affording them another stable and permanent home within a defi-

nite . . . period.' " (*In re Joshua M.* (1998) 66 Cal.App.4th 458, 474 [78 Cal.Rptr.2d 110].) Further, " '[i]t is reasonable for the state, before expending its limited resources for reunification services, to distinguish between those who would benefit from such services and those who would not.' " (*Ibid.*)

Here, the court relied on section 361.5, subdivision (b)(10) and (11). Under this subdivision, services may be denied when a parent's reunification services or parental rights have been terminated in earlier proceedings involving a sibling or half sibling, and the parent "has not subsequently made a reasonable effort to treat the *problems that led to removal*" of the sibling or half sibling. (§ 361.5, subd. (b)(10) & (11), italics added.) These exceptions " 'recognize[] the problem of recidivism by the parent despite reunification efforts. Before this subdivision applies, the parent must have had at least one chance to reunify with a different child through the aid of governmental resources and fail to do so. Experience has shown that with certain parents . . . the risk of recidivism is a very real concern. Therefore, when another child of that same parent is adjudged a dependent child, it is not unreasonable to assume reunification efforts will be unsuccessful. Further, the court may still order reunification services be provided if the court finds, by clear and convincing evidence, that reunification is in the best interests of the child. (§ 361.5, subd. (c).)' " (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744–745 [110 Cal.Rptr.2d 828, 28 P.3d 876].)

The " 'reasonable effort to treat' " standard found in subdivision (b)(10) and (11) of section 361.5 "is not synonymous with 'cure.' " (*Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464 [118 Cal.Rptr.2d 118].) To be reasonable, the effort must not be "lackadaisical or half-hearted." (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 99 [42 Cal.Rptr.3d 504].)

2

C.G. challenges the sufficiency of the evidence to support the court's implied finding that she did not make "a reasonable effort to treat the problems that led to removal" (§ 361.5, subd. (b)(10) & (11)) in the prior dependency proceedings. She asserts she did make a reasonable effort by ending her relationship with her abusive boyfriend. She asserts that because the prior petitions alleged physical abuse and domestic violence, and did not allege drug abuse, the denial of services in this proceeding may not be based on the lack of a reasonable effort to treat her drug problem.

Preliminarily, we must address the breadth of the term "problems that led to removal" as used in section 361.5, subdivision (b)(10) and (11). The interpretation of a statute is a question of law we review independently. (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 195 [136 Cal.Rptr.3d 813].)[6] The "overriding goal of statutory construction is to give effect to the law's purpose." (*Ibid.*) We first look to the language of the statute, and when there is no uncertainty as to legislative intent we look no further. (*Renee J. v. Superior Court, supra,* 26 Cal.4th at p. 743.) A statute, however, "should not be given a literal meaning if to do so would create unintended, absurd consequences. Instead, 'intent prevails over the letter of the law and the letter will be read in accordance with the spirit of the enactment.' " (*In re Gabriel K.,* at p. 196.)

Interpreting section 361.5, subdivision (b)(10) and (11) in the manner C.G. urges—to restrict the term "problems that led to removal" to problems alleged in the petition—would lead to an absurd result. C.G.'s drug abuse has been a recurrent theme. It unquestionably posed a problem throughout the prior proceedings because it was a substantial component of her service plan. " '[T]he focus of reunification services is to remedy those problems which led to the removal of the children.' [Citation.] A reunification plan must be tailored to the particular individual and family, addressing the unique facts of that family. [Citation.] A social services agency is required to make a good faith effort to address the parent's problems through services, to maintain reasonable contact with the parent during the course of the plan, and to make reasonable efforts to assist the parent in areas where compliance proves difficult." (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598 [30 Cal.Rptr.3d 320].) C.G.'s failure to reunify with her older children was based, at least in part, on her failure to submit to or satisfactorily complete drug testing and treatment.

To avoid an absurd result, we construe the term "problems that led to removal" in section 361.5, subdivision (b)(10) and (11) to include drug abuse, even though it was not alleged in the petitions. The legislative intent is to promote the interests of children, and conserve limited resources, by not ordering services when parents have demonstrated in prior proceedings that they would be fruitless.

Moreover, substantial evidence supports the finding that after her parental rights were terminated in the prior proceedings, C.G. did not make a reasonable effort to treat the problem. She has had years to address her drug abuse, and her refusal to voluntarily drug test and participate in services in this case signifies her lack of interest in treatment. The "failure to seek

---

[6] It does not appear that C.G. raised the statutory issue during the hearing. We nonetheless consider it because it is a legal issue.

voluntary treatment could suffice to show resistance to treatment." (*D.B. v. Superior Court* (2009) 171 Cal.App.4th 197, 205 [89 Cal.Rptr.3d 566] [discussing § 361.5, subd. (b)(13)].)

B

■ Alternatively, C.G. contends that even if statutory exemptions to the general mandate of reunification services exist, the juvenile court abused its discretion by not ordering services for her. Despite the applicability of subdivision (b)(10) and (11) of section 361.5, the court retains authority to order services if it finds by clear and convincing evidence they would be in the children's best interests. (§ 361.5, subd. (c).) In making its determination, the court may consider the "failure of the parent to respond to previous services." (*Ibid.*)

C.G. has the burden of proving her children would benefit from the provision of court-ordered services. (*In re Gabriel K., supra*, 203 Cal.App.4th at p. 197.) She asserts the legislative purpose of avoiding needless delay is of no concern because the court ordered services for Michael; services are in the children's best interests because Michael may reunify with them, and if so, she will have some degree of contact with them; and if given services, she may reunify with the children. C.G. claims "there existed no rational basis for denying [her] reunification services."

Again, however, C.G. steadfastly refused to voluntarily drug test or participate in drug treatment in this case. C.G. testified she would participate in court-ordered services, but the court, which witnessed her demeanor, expressly found she was not a credible witness. "We may not substitute our assessment of the credibility of a witness in place of the credibility assessment of the trial court." (*In re Ana C.* (2012) 204 Cal.App.4th 1317, 1329 [139 Cal.Rptr.3d 686].) Further, the social worker found it unlikely that C.G. would participate in court-ordered services, given her refusal to participate voluntarily. The court explained it "would really love to give services" to C.G., but it could not find by clear and convincing evidence they would be in the children's best interests.

A court abuses its discretion "when it renders a ruling that is absurd or beyond the bounds of reason, all of the circumstances considered." (*In re Ana C., supra*, 204 Cal.App.4th at p. 1326.) Under these circumstances, the court reasonably found the provision of services would be fruitless and not in the children's best interests. Further, "[i]n an era of dwindling resources, the state may reasonably focus its reunification [services] on those families most likely to be reconciled." (*In re Gabriel K., supra*, 203 Cal.App.4th at p. 196.)

## DISPOSITION

The judgments are affirmed.

Benke, J., and Aaron, J., concurred.