Filed 4/15/14  In re Lana S. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re Lana S. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D064610 |
| Plaintiff and Respondent, | (Super. Ct. No. J515203D-E) |
| v. | |
| C.G., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Neil R. Trop, by appointment of the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minors.

C.G. appeals juvenile court orders terminating her parental rights to her children, Lana S. and Landon S. She challenges the sufficiency of the evidence to support the court's finding that the beneficial parent-child relationship exception to termination of parental rights and adoption found in Welfare and Institutions Code[1] section 366.26, subdivision (c)(1)(B)(i) (hereafter § 366.26(c)(1)(B)(i)) is inapplicable. We affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Previous Two Dependency Cases*[2]

C.G. has a lengthy history of drug abuse and child protective services intervention. In 2003 the San Diego County Health and Human Services Agency (the Agency) took her eldest son, Joshua G., into protective custody at birth because they both tested positive for methamphetamines. C.G. admitted a history of drug abuse during the pregnancy. She participated in reunification services, including a drug treatment program, and reunified with Joshua in 2005.

Later in 2005, however, the Agency again took Joshua into protective custody, along with C.G.'s eldest daughter, S.G., because of the physical abuse of Joshua. C.G. originally confessed to harming him, but she recanted after she was arrested and blamed her live-in boyfriend, Shawn B.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     The following summary of the prior dependency proceedings in this matter is derived from this court's opinion in *In re Lana S.* (2012) 207 Cal.App.4th 94, 98-99.

In 2006 C.G. gave birth to Shawn G., whose alleged father was Shawn B. Shawn G. was taken into protective custody because of a domestic violence incident between C.G. and Shawn B. C.G. admitted to the social worker that she was involved in "several domestic violence incidents in the past."

The Agency's August 2011 detention report in the current (third) dependency case (discussed, *post*) states that, in the prior proceedings, C.G.'s service plan required her to "[reenroll] in individual therapy, participate in an in-home parenting education program, and maintain regular visitation with the children. At some point, she was also required to complete a second psychological exam, continue in individual therapy, domestic violence classes, and substance abuse testing."

The report also states: "Throughout the duration of her [second dependency] case, there were concerns that [C.G.] was using drugs, as evidenced by her pattern of no-shows when asked to submit to random drug tests, showing up to the drug[-]testing site and reporting that she could not produce a urine sample, or showing up to drug test at times not designated by the social worker. In November of 2006, [C.G.] tested positive for methamphetamine and since that time she failed to complete drug tests for SARMS [(Substance Abuse Recovery Management System program)]."

The report adds that,"[t]hroughout the duration of her second dependency case, [C.G.] was asked to submit to random drug testing as part of her case plan." Further, C.G. "was asked to enroll in in-patient drug treatment [but] she refused. [She] continued to deny her drug use and therefore failed to adequately address and remedy her drug issues. . . . [She] failed to acknowledge and/or take responsibility for addressing her drug

3

issues, which appeared to contribute to her *inability to maintain a safe home for her children.*" (Italics added.)

The detention report also shows C.G. had a criminal history dating back to 2002 for charges including vehicle theft, burglary, receipt of stolen property, possession of a controlled substance, infliction of injury to a child, and willful child cruelty.

A November 2006 report of a psychological evaluation of C.G. performed by Louise Green, Ph.D., states that C.G. reported that, in the earlier dependency proceeding for Joshua, she "was kicked out" of KIVA, a residential drug treatment program,[3] "because she would not complete the work assignments she was given." The report states that in psychological testing, C.G. exhibited a "profile . . . similar to that found in individuals who have proven vulnerable to difficulty in managing alcohol and any drugs give them an immediate relief from tension." The report also states that since C.G. had not developed "many life coping skills that enable her to deal well with stress," she "remains vulnerable for substance abuse."

In the summer of 2007, C.G.'s reunification services and parental rights over the three children were terminated. She appealed and this court affirmed the judgments. (*In re Joshua G.* (Apr. 11, 2008, D051499) [nonpub. opn.].) The children were ultimately adopted.

---

[3] See *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1397.

B. *Current Dependency Proceedings*[4]

Lana was born to C.G. in the fall of 2007, and Landon was born to her in early 2009. C.G. and the children's presumed father, Michael S. (father), separated in 2011. In August 2011, C.G.'s boyfriend, Justin D., was living with her and the children.

According to the Agency's August 2011 detention report, police officers went to the home on August 15 on a domestic violence call. C.G. said she and Justin were just arguing. She quickly walked toward her bedroom in the back of the apartment, but officers stopped her. She became confrontational and yelled. In plain view, and within the children's reach, the officers found drug paraphernalia in the bedroom, including glass pipes, burnt foil, a burnt tablespoon and a blowtorch. They found more glass pipes and a "compressed pellet gun" inside an open drawer.

C.G. denied drug use, but Justin reported she used heroin and methamphetamines, and she had last used methamphetamines the previous night. The home was foul smelling and filthy, with "piles of dirty clothing, trash, and rotten food thrown throughout the living room" and "animal feces and urine on the floors." C.G., however, did not feel the home was unfit for the children, who also were filthy. C.G. was arrested for possession of drug paraphernalia, obstruction of justice, and child cruelty.

C.G. was released on bail, and on August 17 a social worker, accompanied by police officers, made an unannounced visit to her home. The social worker checked

---

4      The following summary of the current dependency proceedings is also derived, in large part, from this court's opinion in *In re Lana S.*, *supra*, 207 Cal.App.4th at pages 100-102.

C.G.'s bedroom and saw a glass bong on top of a dresser in the open closet. C.G. denied any drug use since she was a teenager, despite evidence to the contrary in the prior dependency proceedings. She vehemently refused to voluntarily drug test. C.G. reported that the children had been in the care of their maternal grandmother since August 15, but C.G. gave the social worker a false address for the grandmother. After a brief period, C.G. ordered the social worker and officers to leave.

1. *August 2011 petitions*

On August 24, 2011, when the children were located, the Agency took them into protective custody and filed petitions on their behalf under section 300, subdivision (b). Lana was then three years of age and Landon was two.

Both children tested presumptively positive for methamphetamines, but confirmatory testing was negative. Medical personnel explained to the social worker that cutoff levels for an initial screening are lower and detect exposure through any factors, including environmental exposure. That amount, however, may "not be high enough to produce a confirmatory positive."

C.G. told the social worker that when police officers arrived at her home on August 15, she had just returned from a two-week vacation to Washington State. She said she could produce evidence of the trip, such as gas receipts, in court. She let one of Justin's friends stay at her home during her absence, and she surmised he threw a party, trashed the place and left the drug paraphernalia behind. C.G. again refused to voluntarily drug test. She also refused other voluntary services. She "did not give a sober date and stated that she [was] in treatment before but it did not work for her. [She]

6

said that being around other[s] that use and have a problem doesn't help her. [She] did not give any specific information on the substance abuse program she participated in or the dates of enrollment."

2. *December 2011 contested adjudication and disposition hearing*

In its September 2011 jurisdictional and dispositional report, the Agency recommended the denial of services to C.G. because, among other things, she "[failed] to reunify with [three] older children [who] were removed due to [her] . . . substance abuse . . . ."

The report stated that the paternal aunt and uncle confirmed the father was using drugs. C.G. had had a chronic substance abuse problem for over 10 years and had failed to successfully complete any drug treatment program. The father had had a reported drug abuse problem for over 40 years.

The report also stated that on September 12, C.G.'s phone accidentally called the social worker's phone. On C.G.'s phone, the social worker overheard a conversation taking place between C.G. and Justin. The report stated the following "is a summary of concerning statements" between them:[5]

> "Justin: Where is the mouse? Car sounds . . . continuous beeping
>
> "[C.G.]: I don't fucking know. Move away from me.
>
> "Justin: Where is the mouse? I need the mouse. Give me the mouse.

---

[5]      Except for using C.G.'s protective initials rather than her name, we repeat the report's language verbatim. We do not point out or correct any errors in grammar or punctuation, but we do omit italics and boldface type.

7

"[C.G.]: You can't wait for five fucking minutes? Give me the shit that's mine. I'll give it to you after me. Unzipping sounds . . .

"Justin: No I paid. That's was mine. It's was all my shit.

"[C.G.]: You're a fucking punk. You steal from me all the time. It's my shit, 60.00 dollars is yours the rest of it is mine. 60 dollars is what you get. That's my hook up you fucking prick. Hell no. You're not married. I'm not married to you.

"Justin: Exactly, so you ain't getting half of mine. I'm going to tell my grandma you took it."

"[C.G.]: Then I'm going to tell your grandma you're a fucking heroin addict. . . . You're going to use my shit so you can sell it to your brother so you can get a fucking computer. Bye I'm calling your grandma."

In an addendum report, the social worker explained that C.G. was provided with referrals for a parenting class and a drug abuse assessment and "strongly encouraged" to voluntarily participate. She did not attend and showed no interest in those services or any type of drug treatment. Further, she was asked to submit to on-demand drug testing four times, but she did not show up.

a. *Hearing, judgments, and C.G.'s prior appeal*

The contested adjudication and disposition hearing was held in December 2011. The social worker testified she made "a variety of attempts to offer voluntary services" to C.G., and encouraged her to participate, but she refused. The social worker also testified C.G. never provided any proof of a trip to Washington. As to the recommendation of no services for C.G., the social worker explained: "The main concern . . . is the fact that [C.G.] is in denial of substance abuse history and use. It's a huge concern because if a

8

parent denies having any problems, then they will not often seek any treatment, and she has been very resistant to doing any type of services. And if we had seen that she had been participating in voluntary services, then we certainly would have reexamined our position in giving [her] services. But at this point, . . . other than visitation, [she] has not been willing to do an assessment or address any of the concerns that we have."

The social worker clarified that C.G. said she would participate in services if they were court ordered. In the social worker's view, however, it was unlikely that a parent who refused voluntary services would participate in court-ordered services.

C.G. testified she had given receipts from her Washington trip to her former attorney and was unable to retrieve them. She explained she refused voluntary services "[b]ecause in the past, I have completed services, and I completed everything, and the outcome was still the same." She said she would participate in court-ordered services to get her children back. C.G. claimed the last time she smoked methamphetamine was in 2003, and her test in 2006 was not positive, but presumptively positive because she did not show up. As to the phone conversation between her and Justin, C.G. testified they were talking about a computer mouse, not drugs.

The court assumed jurisdiction over the children and placed them with paternal relatives. It ordered services for the father and no services for C.G. C.G. appealed and this court affirmed the judgments. (*In re Lana S.*, *supra*, 207 Cal.App.4th at p. 98.)

9

### 3. *June 2012 six-month review hearing*

In February 2012 the court appointed a court-appointed special advocate (CASA)[6] for the children. In her June 2012 "Voices for Children" report, the CASA stated that during the first six-month reunification phase, C.G. had minimal contact with the social worker and remained living with Justin D. Up until May 2012, C.G. had weekly supervised visits once at a visitation center, but she was often late in arriving. Her visits remained supervised because of her refusal to submit to on-demand drug testing. In May 2012 she lost her time slot at the visitation center due to three missed visits without advance notice or calling.

The CASA also stated in the report that she observed one of C.G.'s visits with the children. The visit went fairly well as C.G. was on time, was attentive to the children, and interacted with them. The CASA stated that Lana and Landon "seemed a little distant with [C.G.], and did not appear upset when they left the visit. Lana and Landon's caregivers have stated that the children were often agitated after visits with [C.G.]." The children talked to the CASA about C.G. and asked the CASA whether she was going to take them to visit with C.G. again.

In the Agency's June 2012 status review report, the social worker stated that C.G. "appears to continue her struggle with substance abuse" and that "[d]espite the termination of reunification services, [she] has not made any attempts to enter drug

---

6    A CASA is charged with "[p]rovid[ing] independent, factual information to the court regarding the cases to which he or she is appointed" and "[r]epresent[ing] the best interests of the child[ren] involved, and consider[ing] the best interests of the family." (§§ 101, subd. (c), 102, subds. (c)(1)-(c)(2).)

treatment or attend parenting classes to demonstrate her willingness to become a safer and healthier parent for Lana and Landon." The report also stated C.G. "continues to appear unable or unwilling to maintain sobriety which poses a safety risk to the children."

At the June 2012 six-month review hearing, after considering both reports, the court found by clear and convincing evidence that the return of the children to the custody of C.G. and the father would create a substantial risk of detriment to the children's physical and emotional well-being. The court also found the father was making progress and ordered further services for him.

4. *December 2012 12-month review/detention hearing*

In the Agency's December 2012 status review report, the social worker stated that C.G. "appears to continue her struggle with substance abuse as she has been seen wandering her neighborhood looking dazed and under the influence." She still had not made any attempts to enter drug treatment or other services to demonstrate her willingness to become a safer and healthier parent. However, she was visiting the children fairly regularly each week at the new visitation center and the children appeared to enjoy the visits. C.G. apparently had moved because all her mail sent by the Agency had been returned.

The report also stated that the father was permitted unsupervised and overnight visits at the relative caregiver's home because he was making good progress with his drug treatment program. However, the father admitted to the social worker on October 31, 2012, that he felt like giving up his attempt to reunify with his children due to his lack of confidence and resources to become a full-time father.

11

Lana and Landon had been placed in the home of their relative caregivers in early November 2011. However, the caregivers made the decision they could not care for the children in their home any longer.

As a result, the Agency filed section 387 supplemental petitions to elevate the children's level of care from relative to foster care and on November 30, 2012, Lana and Landon were moved to a confidential foster home.

At the December 2012 12-month review/detention hearing, the court sustained the section 387 petitions and ordered the children placed in the confidential foster home. The court found the father continued to make progress.

5. *February 2012 18-month review hearing*

In the Agency's February 2012 status review report, the social worker stated that, since the last hearing, the father had failed to follow up on resources provided to him to obtain housing, had failed to engage in individual therapy, and was not active in his drug treatment program. The report also stated that "[t]his has not only delayed the expansion of visitation but has halted the process of reunification, as the father has not demonstrated his ability to meet the basic needs of the children."

The report indicated it was unclear where C.G. resided and stated it appeared she was continuing to struggle with substance abuse as her behavior was at times erratic, and she appeared increasingly emaciated. She still had not made any attempts to enter drug treatment or attend other services to show a willingness to become a safe and healthy parent. While C.G.'s contact with the social worker had been "minimal," she continued to visit most weeks at the visitation center, but at times either did not show up or arrived

late.  However, the children enjoyed the visits and C.G.'s interactions with them were positive.  Previously, both children had trouble regulating their emotions after visits with their parents, but those behaviors had decreased during the prior two months.

In her February 2013 report, the CASA stated that because the children's confidential foster parents were not willing to adopt the children, a permanency team decision-making meeting was held to discuss moving them to an adoptive home.  Lana's former kindergarten teacher attended and expressed a desire to adopt both children.

In February 2013 the children began visiting with the proposed caregivers, Lana's former teacher and her husband.

6. *March 2013 contested 18-month review hearing*

In the Agency's March 2013 addendum, the social worker stated she had referred the children to therapy to address grief and loss.   The report stated that, "[w]hile the father completed some services and made substantial progress in services during the first [six]-month period[,] his progress and participation has significantly decreased during the last [two] reporting periods."  It also stated that, although the father "clearly loves his children," he "has failed to verify his sobriety," and he had "failed to build his confidence as a single father and continues to lack the motivation needed to change his circumstances."  The report informed the court that the Agency had begun the process of locating an adoptive family for the children.

At the March 2013 contested 18-month review hearing, the court found the father had not made substantive progress with the provisions of the case plan, terminated the

13

father's reunification services, and set a section 366.26 hearing to determine a permanent plan for the children.

7. *July 2013 section 366.26 hearing*

For the section 366.26 hearing held on July 24, 2013, the Agency submitted a section 366.26 report prepared by adoptions social worker Lisa Salsbury, who recommended adoption as the children's permanent plan.

On June 14, 2013, the children were moved to their prospective adoptive home. In her report, Salsbury stated that the children's caregivers, Lana's former teacher and her husband, had begun providing them with daily parenting on that date.

Salsbury's report indicated the children were adoptable because their caregivers, Lana's former teacher and her husband, were committed to making the children permanent members of their family, and they loved the children unconditionally. Also, numerous families with approved adoptive-home studies were willing to adopt a sibling set of two children with characteristics similar to those of Lana and Landon. Salsbury opined that, although each child had positive visits with C.G. and the father, those experiences did not amount to a beneficial parent-child relationship.

In her report, the children's CASA also recommended adoption, stating the children's new home "is the best home for them and they should remain there." The report stated the children began visiting with the caregivers in April 2013, these visits increased in May, and overnight visits began in early June. The report also indicated the children were "doing well in their new home and did well with the transition." The CASA recommended that the therapy the children were receiving should continue to

14

"help [them] deal with the recent big changes in their lives in regards to their new placement and school."

The court granted the parents' requests for a contested section 366.26 hearing (discussed, *post*) regarding termination of their parental rights.

8. *Contested September2013 section 366.26 hearing*

The contested section 366.26 hearing was held in September 2013. The court heard testimony from the Agency's social worker, Salsbury, and received into evidence without objection Salsbury's section 366.26 report (discussed, *ante*), bonding studies of C.G. and the father conducted by Robert Kelin, Psy.D., Salsbury's curriculum vitae, and the CASA's Voices for Children report (discussed, *ante*).

a. *Dr. Kelin's bonding studies*

Dr. Kelin had conducted two bonding studies that month. Pertinent to this appeal is the bonding study of the children's relationships with C.G. Dr. Kelin conducted the study by observing C.G. and the children over the course of about one hour. On a scale of no bond, mild bond, moderate bond, and strong bond, Dr. Kelin opined the children had a moderate bond with C.G. and the bond was parental in nature. Dr. Kelin indicated the children seemed comfortable with C.G. They initiated physical contact with her at the beginning of the bonding study, and then maintained regular conversations with her. They turned to her for direction and seemed to get support from her. In the study report, Dr. Kelin stated it was "difficult" to determine whether the children's bond with C.G. was a primary bond "without seeing if they might be more attached to someone else, such as a

15

foster mother." Dr. Kelin also stated that if the moderate bond "were severed, there could be some damage to the children."

b. *Testimony of social worker Salsbury*

Salsbury testified to the contents of her section 366.26 report, as well as the following. She was assigned this case in April 2013. She was familiar with bonding studies and had reviewed Dr. Kelin's bonding studies for Lana and Landon. She stated Dr. Kelin's bonding study was different than the attachment and bonding assessment she conducted in this case because the bonding study is not standardized, and it is a one-time snapshot of a visit between a parent and child. Salsbury testified that in her role as an adoptions social worker, she assessed the entire case and observed multiple visits between the children and the parents and also observed the children in their foster placement and school environments and their interactions with other adults. Dr. Kelin's observations of the children were similar to what she had observed.

Salsbury testified she talked to Lana and Landon about adoption, in a manner appropriate for their ages (five and four, respectively), by discussing that adoption meant they would have a "forever" home—a home that is safe where they could grow up and be a part of a family and share living experiences—and that the children could grow up together as siblings. She also discussed with the children that they would never be able to see their parents again if they were adopted. The children responded they would be sad if that were to happen.

Salsbury stated that before the children moved into their prospective adoptive home, she again talked to them about moving into that home. The children on their own

16

identified this home as a forever family. As she was driving the children back home after they had participated in Dr. Kelin's bonding study, Salsbury asked them if they remembered what adoption meant. The children responded by stating that adoption meant that another family took care of you and they were your forever family. The children told her they were currently living with their forever family and *wished to continue living there*.

Salsbury testified that grief and loss is a normal reaction when children who know their parents are adopted. A child's grief and loss is addressed through therapy. The consequences to children who lose a close relationship as a result of adoption are also addressed through counseling and educating the adoptive parents about how to help the children work through that grief and loss.

Salsbury also testified that the children had experienced five placements during their dependency. She stated that dependent children who have experienced multiple placements can develop emotional distress from "having temporary caregivers and not having stability in their lives" and having "no stability in relationships with schools or peers or with other people." Salsbury testified that Lana and Landon were "forming a healthy relationship bond with their current caregivers." Salsbury also indicated she was aware C.G. had recently been arrested for drugs and paraphernalia. The court then addressed and rejected C.G.'s claim that the beneficial parent-child relationship exception codified in section 366.26(c)(1)(B)(i) applied. While the court found that a "good relationship" and a "bond" existed between the children and their parents and that the parents had maintained regular visitation, it also found the evidence did not show there

17

were "compelling reasons that the termination of parental rights would cause significant detriment to these children due to the parent/child bond," and thus the beneficial parent-child relationship exception did not apply. Noting that C.G.'s bond with the children "was not so strong from [C.G.'s] standpoint that she would be willing to drug test in order to have more and more contact with [them]," the court observed: "That's a window into where the parent is when it comes to the parent-child bond." The court indicated the children would benefit from having continued contact with the parents, but observed that this is "true for any adult who shows love and care and attention to children."

Noting that the children had experienced various foster home placements, the court also stated "it is now time for us to ensure their stability and ensure that their life is, in fact, permanent, that they know where they belong, these kids in particular given the number of placements that they've had." In considering the parent-child bond and what C.G. could offer the children, the court took into account her history in terms of her "loss of other children to the dependency process," including her criminal and drug behavior, in finding that all of those things factored into "the definition of what a parent is." The court noted the failure of the reunification services. For all of these reasons, the court determined it was "best for the children" that they be adopted by the prospective adoptive parents. The court then terminated parental rights and ordered adoption as the children's permanent plan. C.G.'s appeal followed.

## DISCUSSION

C.G. contends the court erred by not applying the beneficial parent-child relationship exception set forth in section 366.26(c)(1)(B)(i) so as to preclude the

18

termination of her parental rights.  Specifically, she claims the evidence is insufficient to support the court's finding that the exception did not apply.  We conclude substantial evidence supports the court's finding.

A.  *Applicable Legal Principles*

1.  *Beneficial parent-child relationship exception*

When reunification services are terminated, the focus of a dependency proceeding shifts from preserving the family to promoting the best interest of the child, including the child's interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child.  (*In re Fernando M*. (2006) 138 Cal.App.4th 529, 534.)  At the section 366.26 selection and implementation hearing, the juvenile court has three options:  (1) Terminate parental rights and order adoption as the permanent plan; (2) appoint a legal guardian for the dependent child; or (3) order the child placed in long-term foster care.  (*Ibid*.)

Adoption is the permanent plan preferred by the Legislature.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).)  Thus, "[i]f the child is adoptable, there is a strong preference for adoption over alternative permanency plans."  (*In re Michael G.* (2012) 203 Cal.App.4th 580, 588 (*Michael G.*).)  All that is required to show a dependent child is adoptable is "clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time."  (*In re Zeth S.* (2003) 31 Cal.4th 396, 406 (*Zeth S.*); see § 366.26, subd. (c)(1).)  The issue of adoptability focuses on the child and whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child.  (*Zeth S.*, at p. 406; *Michael G.*, *supra*, at p. 589.)

19

At a section 366.26 hearing, once the juvenile court finds by clear and convincing evidence that the child is likely to be adopted within a reasonable time, the court is required to terminate parental rights and select adoption as the permanent plan unless the parent shows that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivisions (c)(1)(A) and (c)(1)(B). (*Michael G.*, *supra*, 203 Cal.App.4th at p. 589; *In re Erik P.* (2002) 104 Cal.App.4th 395, 401.)

The beneficial parent-child relationship exception found in section 366.26(c)(1)(B)(i) provides an exception to the adoption preference if the juvenile court finds a "compelling reason" for determining that termination of parental rights would be "detrimental" to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would *benefit from continuing the relationship*." (§ 366.26(c)(1)(B)(i), italics added.) This court has interpreted the statutory phrase "benefit from continuing the relationship" to mean that the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) We explained in *Autumn H.* that, in determining whether the child would benefit from continuing the parent-child relationship for purposes of the beneficial parent-child relationship exception, the juvenile court "balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a *substantial, positive emotional*

20

*attachment* such that the child would be *greatly harmed*, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid*., italics added; accord, *In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

To meet his or her burden of establishing the applicability of the beneficial parent-child relationship exception, the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827 (*Derek W.*).) "Interaction between natural parent and child will always confer some incidental benefit to the child." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) The beneficial parent-child relationship exception "applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Ibid*.) Thus, the parent must show he or she occupies a parental role in the child's life. (*Derek W.*, at p. 827.)

Furthermore, "[a] biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to *some* degree, but that does not meet the child's need for a parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466, second italics added.)

2. *Standard of review*

On review of the sufficiency of the evidence to support a juvenile court's order terminating parental rights and freeing the parent's child for adoption, "[w]e presume in

favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) "We must affirm the juvenile court's rejection of any exception to termination of parental rights if the court's findings are supported by substantial evidence." (*Michael G.*, *supra*, 203 Cal.App.4th at p. 589, citing *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

"The appellate court does not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court. [Citations.] The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*Michael G.*, *supra*, 203 Cal.App.4th at p. 589.)

B. *Analysis*

In challenging the sufficiency of the evidence to support the court's finding that the beneficial parent-child relationship exception (§ 366.26(c)(1)(B)(i)) did not apply, C.G. acknowledges she lost custody of her children because she had a history of drug abuse, both drugs and drug paraphernalia were found in the family home, and she was denied reunification services. However, she asserts she visited the children regularly, her relationship with them was parental in nature, and they would benefit from continuing their relationships with her.

These assertions are unavailing because substantial evidence supports the court's determination that C.G. did not meet her burden of showing the benefits to Lana and Landon from continuing C.G.'s parent-child relationship with them were so substantial as

22

to outweigh the benefits they would gain in a permanent home with new, adoptive parents. (See *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

First, substantial evidence supports the court's implied finding the children did not have such a substantial, positive emotional attachment to C.G. that they would be greatly harmed by termination of C.G.'s parental rights. (See *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) C.G. points to evidence showing the Agency's adoptions social worker, Salsbury, observed during C.G.'s supervised visits with the children that C.G. engaged in positive interaction with them and demonstrated "some parenting skills" such as feeding the children, helping them with hygiene, and expressing concern about their well-being.

However, as already noted, "[i]nteraction between natural parent and child will always confer some incidental benefit to the child." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Furthermore, a biological parent who, like C.G., has failed to reunify with an adoptable child "may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 466.)

Here, although C.G. showed she loves and cares about Lana and Landon and demonstrated some parenting skills during supervised visitation with them, this was not enough to show she "occupie[d] a 'parental role' in the child[ren]'s li[ves]." (*Derek W.*, *supra*, 73 Cal.App.4th at p. 827.) C.G. essentially disregards substantial evidence showing that, although Lana and Landon experienced positive supervised visits with C.G., in Salsbury's professional opinion those experiences did not amount to a beneficial parent-child relationship. Substantial evidence supports the court's express finding that,

23

although there was a "good relationship" and a bond between C.G. and the children, C.G.'s bond with them "was not so strong from [C.G.'s] standpoint that she would be willing to drug test in order to have more and more contact with the [them]." The record shows the children were removed from C.G.'s custody due to her chronic drug abuse problem, and during the dependency period Agency social workers repeatedly and strongly encouraged her to address her drug abuse problem by participating in substance abuse treatment programs and submitting to drug testing, but she steadfastly refused.

Substantial evidence also supports the court's finding there was no compelling reason to find that termination of parental rights would cause significant detriment to the children. In his bonding study, Dr. Kelin opined the children had a moderate bond with C.G., and there could be "some" damage to the children if the bond were severed. However, he also concluded it was "difficult" to determine whether the children's bond with C.G. "was a primary bond without seeing if they might be more attached to someone else, such as a foster mother." Social worker Salsbury testified the children had told her they would be sad if they were adopted and did not see their parents again. However, Salsbury testified grief and loss is a normal reaction when children who know their parents are adopted, and a child's grief and loss is addressed through therapy. Salsbury also testified that Lana and Landon referred to their adoptive family as their "forever family" and that they wished to continue living with them. In her report, Salsbury stated that Lana's caregivers—Lana's former teacher and her husband—were committed to making the children permanent members of their family and they loved the children unconditionally. As already discussed, the statutory preference for adoption cannot be

24

overcome unless the children would be greatly harmed by the termination of parental rights. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; accord, *In re Jason J.*, *supra*, 175 Cal.App.4th at p. 936.) Here, there is no evidence Lana and Landon would be greatly harmed by the termination of parental rights.

Last, substantial evidence supports the court's determination that C.G. did not meet her burden of showing the benefits to Lana and Landon from continuing C.G.'s parent-child relationship with them were so substantial as to outweigh the benefits they would gain in a permanent home with new, adoptive parents. At the time of the September 2013 selection and implementation hearing, Lana was five years old and Landon was four. They had been removed from C.G.'s custody about two years earlier in August 2011 when Lana was still three and Landon was two. Thus, the children had been out of parental custody for about half of their young lives. Salsbury testified the children had experienced five placements during their dependency. She stated that dependent children who have experienced multiple placements can develop emotional distress from having temporary caregivers and by not having stability in their lives. Salsbury also testified that Lana and Landon were "forming a healthy relationship bond with their current caregivers." The children's CASA representative also recommended adoption as the best permanent plan for them. Although the evidence showed C.G. and the children had pleasant and loving interactions in a supervised setting during the dependency period, to meet her burden of demonstrating the applicability of the beneficial parent-child relationship exception, C.G. was required to show more than frequent and loving contact,

25

an emotional bond with the child, or pleasant visits. (*Derek W.*, *supra*, 73 Cal.App.4th at p. 827.) The record establishes she failed to meet her burden.

For all of the foregoing reasons, we conclude substantial evidence supports the court's finding that the beneficial parent-child relationship exception to termination of parental rights and adoption found in section 366.26(c)(1)(B)(i) did not apply.[7] Accordingly, we affirm the orders terminating her parental rights to her children Lana and Landon.

DISPOSITION

The orders are affirmed.

NARES, Acting P. J.

WE CONCUR:

McDONALD, J.

AARON, J.

---

[7] In light of our conclusion, we need not address C.G.'s assertion that application of the beneficial parent-child relationship exception would not interfere with the implementation of a guardianship.