Filed 12/31/14  In re Jamie S. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re JAMIE S., et al., Persons Coming Under the Juvenile Court Law. | D066066 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J51746 C & D) |
| v. | |
| SANDRA R., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Neil R. Trop, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Emily K. Harlan, Deputy County Counsel, for Plaintiff and Respondent.

William Hook, under appointment of the Court of Appeal, for the Minors.

After a lengthy evidentiary hearing, the juvenile court granted D.S.'s petition for modification (Welf. & Inst. Code, § 388)[1] to terminate Sandra R.'s guardianship over D.S.'s children, Jamie and Elijah S., based on Sandra's physical abuse of children in her care and chronic marijuana use. Sandra contends the court erred by considering the petition because *In re Jessica C.* (2007) 151 Cal.App.4th 474 (*Jessica C.*), establishes that section 387 sets forth the exclusive procedure when the termination of a guardianship may result in the children being detained in foster care. She asserts she was prejudiced because under section 388 "less specific and less stringent standards are used in deciding whether removal is warranted." Sandra also contends D.S. did not adduce "new evidence," as that term is defined in *In re H.S.* (2010) 188 Cal.App.4th 103, 105 (*H.S.*), to support a section 388 petition, because her knowledge of Sandra's physical abuse predated establishment of the guardianship. We affirm the order terminating the guardianship.

FACTUAL AND PROCEDURAL BACKGROUND

In April 2009, the San Diego County Health and Human Services Agency (the Agency) filed amended petitions on behalf of Jamie, then five years of age, and Elijah, then three years of age, under section 300, subdivisions (b) and (j). The petitions alleged the children's father, James S., was mentally ill and attempted suicide by overdosing on prescription medications; he admitted using illicit drugs in the children's presence; he

_____

[1]     Future statutory references are to the Welfare and Institutions Code.

2

sexually abused the children's half-sister; and D.S. had a history of alcohol and drug abuse and drug-related offenses.[2] The children were placed in foster care.

D.S.'s service plan included a psychological evaluation, therapy, SARMS (Substance Abuse Recovery Management System program), parenting classes, and supervised visitation. At the six-month review hearing, the court continued her services. At the 12-month review hearing, the court followed the Agency's recommendation to terminate services and schedule a section 366.26 hearing. D.S. had made some progress on her case plan, but she continued to have contact with James and placed her own needs above those of her children. Shortly thereafter, she was incarcerated on a drug charge.

In December 2010, Jamie and Elijah went to Ohio to visit Sandra, their maternal great aunt. Sandra was the adoptive mother of six siblings, and the legal guardian of a niece's two children. An expedited report under the Interstate Compact on the Placement of Children (ICPC) was ordered for potential placement with Sandra, and the Agency obtained a continuance of the section 366.26 hearing to consider placement options.

Sandra received a positive ICPC report, and in April 2011, the court placed Jamie and Elijah with her. She wished to be their legal guardian, and the Agency obtained another continuance of the section 366.26 hearing to further assess the permanent plan.

A contested section 366.26 hearing was held over two days in February and March 2012. The court found by clear and convincing evidence that Jamie and Elijah were

---

2      The Agency also filed petitions on behalf of D.S.'s two older children, but they are not involved in this appeal. James S. is also not involved in this appeal. He was convicted of several sex crimes and received a lengthy sentence.

likely to be adopted, but they were living with a relative who was unable or unwilling to adopt them. The court followed the Agency's recommendation to appoint Sandra as their guardian and terminate jurisdiction. As a matter of courtesy, a social worker in Ohio had visited the children and reported they were happy and doing well.

Sandra later decided she wanted to adopt the children, and the Agency was in accord. In May 2013, the Agency filed a petition for modification (§ 388) requesting termination of the guardianship, reinstatement of jurisdiction, and the scheduling of a permanency planning hearing (§ 366.26) to facilitate adoption. The court resumed jurisdiction and scheduled a section 366.26 hearing for late October 2013.

In early October 2013, D.S. filed a petition for modification (§ 388) requesting termination of the guardianship and return of the children to her custody. The petition alleged D.S. had maintained her sobriety for nearly three years, reentered therapy, regained custody of her two older children, and given birth to a daughter who was placed in her custody. It also alleged "there are allegations of rather severe and extensive abuse . . . by [Sandra] towards the children in her care." D.S. attached several exhibits to the petition, three of which pertained to Sandra's conduct.

The court found D.S. made a prima facie showing as to termination of Sandra's guardianship, but not as to return of the children to D.S. In January 2014, D.S. filed a second petition for modification requesting the same relief. The court determined she made a prima facie showing on the custody issue, and it granted her request to combine the section 388 and 366.26 hearings.

4

A 15-day hearing was held in March and April 2014, in which the court considered whether to remove Jamie and Elijah from Sandra's care. D.S. presented several witnesses.[3] Mitchell testified he moved to Sandra's home when he was around 10 years of age and stayed there several years. During the last months of his stay, Jamie and Elijah were living there. Mitchell saw Sandra smoke marijuana seven or eight times a week. She would remove the tobacco from a "Black and Mild" cigar, replace it with marijuana, light the tip and "take a puff." Sandra's husband did not allow smoking in the house, and she would smoke when she was in the garage with a friend, or when she took Mitchell with her to run errands. She commonly smoked marijuana before driving with him in the car, and he was present when she purchased marijuana.

Additionally, Mitchell testified Sandra had strict rules. For instance, she never allowed the children in the living room, or in the kitchen or the yard if she was not home. If anyone broke a rule, there would be punishment. When Mitchell first arrived, she used grounding for discipline. However, "as the social worker started appearing less and less," punishment became more severe. Sandra made the children squat, meaning "you are basically sitting down without a chair behind you." She did this "a lot." If they stood up before she gave permission, she "would whoop us," meaning she "would make us take off our pants and lay across the bed, and she would hit us across our bottoms with a belt." If a child fell over before time was up, she "would make you start over."

---

3    The record is somewhat unclear on the number of children living with Sandra when Jamie and Elijah arrived. It appears the household included five of Sandra's adopted children, including Frederick, and her niece's children, Mitchell and Michell H., all of whom were minors.

Sandra forced Mitchell to squat "tons of times," for up to an hour, which caused "extreme pain." He got whoopings on a weekly basis. If he covered his bottom, she would strike his back. He and Frederick showed belt marks on their backs to a school counselor, and when they got home Sandra "whooped us again." Mitchell objected to Sandra calling his mother a whore, and she punched him in the chest "as hard as she could" and gave him "a big black bruise." Sandra rubbed "aloe vera gel" on the bruise. She punched him in the chest another time as well. If a child had bruises, Sandra would not allow him or her to go to school "[u]ntil they were barely noticeable or cleared up." After Mitchell told his mother about the abuse, Sandra restricted his telephone access to his mother.

Mitchell's sister, Michell, testified she lived with Sandra for about seven years. Sandra smoked marijuana "like four times a day," in front of "[a]ll the kids," in the basement, in the garage, and in the car. Sandra would "roll up the weed in a [brown] shell, and smoke it." A "shell" had tobacco in it, and Sandra would "pour it out" and "[p]ut the weed in." She sometimes smoked while she was driving, but she would usually "pull over and smoke it." Once when Michell, Jamie, and Elijah were in the car, she pulled over and told them to get out. When they returned, the car "smelled like weed, and it was really strong." Sandra took Michell and Jamie to a man's house where the adults smoked marijuana. Sandra purchased marijuana when Michell was in the car.

Additionally, Michell testified that several times when Sandra had a job interview, "she would need pee for it," and she used the urine of Michell, Jamie and other female members of the household. Sandra told Michell "they could tell . . . if it was a boy's pee

6

or a girl's pee." Michell explained Sandra "would tell us to pee in a cup," and she put the urine in a condom and hid it in her bra.

When Michell moved to Sandra's home, she saw her hit other children and make them squat. After a couple of months, Sandra began treating Michell and Mitchell the same way. Michell explained, "You had to squat, and you had to stay there until she tells you to move. If you move before then or sit down, she whoops you with an extension cord for hours. . . . She would specifically tell you to go get an extension cord, and she would whoop you with it. . . . [I]f you moved, and it hits your face, she'll say you shouldn't have moved." Sometimes Sandra made Michell remove her clothes before a whooping. Michell described whooping as being hit with "[b]elts, shoes, extension cords, and anything else she could get her hands on."

Michell once squatted for more than three hours because Sandra "went to sleep." Sandra accused Michell of moving and gave her a whooping. She also punched Michell in the chest and gave her a bloody nose by punching her in the face. Sandra kept her home from school "[b]ecause I would have bruises and [Sandra] didn't want [anyone] to see them." When the children were bruised, Sandra would "rub us down with aloe vera oil, or aloe vera gel." Michell counted at least 12 scars on her body that Sandra inflicted.

Michell also testified that Sandra hit Mitchell several times, including a hard punch to the chest that made him fall. She hit Jamie in the face and called her a "piss pot" after she wet the bed. She hit Jamie on her bare back. Jamie's back "turned red and [she] dropped to the floor, and then she started crying." Sandra struck Jamie with a belt for such things as "peeing on herself," "sitting outside when she was supposed to come

7

straight home from the bus," "playing in the house," "sitting on the bed," and "turning on the T.V."

Sandra whooped Elijah "with his shirt off with a belt across his back." Sandra slapped Elijah's face a couple of times and left a handprint. She slapped him because he threw up in bed and "couldn't hold it until he went to the bathroom." She beat him with an extension cord because he refused to eat and wasted food. Michell knew that Frederick once reported abuse to his school, and a social worker came to the home. Later, Sandra whooped him in front of the other children with a thick extension cord when he was wearing only underwear.

In the late 1980's, Sandra was C.S.'s foster mother for about a year. C.S. was 14 years of age when she moved to Sandra's home. During the same period, Sandra's young niece, A.M., moved in, along with A.M.'s younger sister. C.S. observed Sandra smoking marijuana and she frequently smelled it in the home. C.S. testified she got into trouble with Sandra, "probably because of my mouth." Sandra "socked" C.S. several times in the chest with "a balled fist," and she cried because of the pain. Sandra whooped the other girls many times with a leather belt when they wore only underwear, and the beatings left welts on their skin.

A.M. testified that Sandra smoked marijuana in the home "[a] couple times a day." A.M. often saw Sandra slap C.S. or punch her in the chest, and she once choked C.S. A.M. did not recall Sandra physically abusing her when she was younger, but after she moved with Sandra to Chicago when she was 10 or 11, "it was just brutal." As A.M. got older, the abuse got worse. A.M. said Sandra was "[r]eally strict, . . . I was on egg shells.

8

I didn't know if . . . I blinked too much if I would get disciplined, meaning slapped in the mouth, whooped to the point where I had welts and bruises, verbal abuse, slapped up side [*sic*] the head, whatever she felt like doing . . . at that time." Sandra split her lip after she got a treat out of the freezer without permission. If A.M. had injuries, Sandra kept her out of school. A.M. has a scar on the back of her leg from being "whooped with a belt that had spikes on it." Sandra slapped A.M.'s sister in the mouth and with a wooden paddle.

The Agency recommended that Jamie and Elijah remain with Sandra. It pointed out that they denied any physical abuse, and it argued that if Sandra used marijuana "this is something that could be ameliorated without removing the children from the home." The children's counsel argued for their immediate removal from Sandra's custody.

On April 11, 2014, the court ordered the immediate removal of Jamie and Elijah from Sandra's custody. It found by clear and convincing evidence there was a change of circumstances and removal would be in the children's best interests, based on "substantial risk of physical abuse and exposure to drugs." The court recited a thorough explanation for its ruling. The court noted that when it established the guardianship, "it was completely unknown to the court that . . . Sandra . . . had a long-term history of abusing children, employing extreme physical abuse, not only directly on children, but in the presence of other children causing extreme fear to them." The court explained in detail why it found the testimony of D.S.'s witnesses credible and persuasive, and the testimony of Sandra's witnesses that no physical discipline or marijuana use ever occurred not credible.

9

On May 29, 2014, the court issued an order granting D.S.'s section 388 petition in part. The court terminated Sandra's guardianship and found it would not be in the children's best interests to provide her with reunification services. D.S. withdrew the portion of her section 388 petition requesting custody of Jamie and Elijah. The children were in foster care, and the court gave the Agency discretion to place them with a nonrelative extended family member. The court scheduled a section 366.26 hearing for July.

## DISCUSSION[4]

### I

### *Use of Section 388 Petition*

### A

Sandra contends the court erred by using section 388 to terminate her guardianship. She asserts that section 387 sets forth the exclusive procedure for the termination of a guardianship when there is any potential the children may be detained in foster care. The applicability of a statute presents a question of law we review independently. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 108.)

An application to terminate a guardianship created by the juvenile court is ordinarily governed by section 388. (*In re Carlos E.* (2005) 129 Cal.App.4th 1408, 1418; *In re Carrie W.* (2003) 110 Cal.App.4th 746, 757; § 360.) Section 388 provides in part: "Any parent or other person having an interest in a child who is a dependent child of the

---

[4]      Jamie and Elijah, through their appellate counsel, join in the in the Agency's positions on appeal.

juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child . . . for a hearing to change, modify, or set aside *any order* of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a)(1), italics added.) "Because the statute states 'any' order, we presume the Legislature intended to permit liberal use of this procedure to challenge all types of orders in an ongoing case, including custody and placement orders." (*In re Victoria C.* (2002) 100 Cal.App.4th 536, 543 (*Victoria C.*).)

A parent seeking termination of a guardianship and return of the children is not required to show any wrongdoing on the guardian's part. (*In re Michael D.* (1996) 51 Cal.App.4th 1074, 1086.) "[T]he thrust of the legislative scheme is to encourage parents to correct earlier problems so as to reunite them with their children. [Citations.] This intent would be thwarted if parents lost all ability to regain custody of their dependent minors, despite rehabilitation and despite having corrected earlier problems, if parents whose rights had not been terminated could only regain custody by proving the minors suffered harm in their current living situation." (*Ibid.*)

A petition to terminate a guardianship under section 388 is subject to the procedure described in California Rules of Court,[5] rule 5.570, "and *Request to Change Court Order* (form JV-180) must be used." (Rule 5.740(c).) The moving party has the burden of proof (Rule 5.570(h)(1)) and, with exceptions inapplicable here, "requests

---

[5] Future rule references are to the California Rules of Court.

11

require a preponderance of the evidence to show that the child's welfare requires such a modification."  (Rule 5.570(h)(1)(C).)

D.S. properly used form JV-180 to petition for termination of Sandra's guardianship and return of Jamie and Elijah to her custody.  The court terminated the guardianship, but D.S. ultimately withdrew her request for custody and the court detained the children in foster care pending a permanency planning hearing.  Sandra contends that because of the foster care component, a section 387 proceeding was required.

Section 387 provides in part:

"(a)  An order changing or modifying a previous order by removing a child from the physical custody of a parent, guardian, relative, or friend and directing placement in a foster home, or commitment to a private or county institution, shall be made only after noticed hearing upon a supplemental petition.

"(b)  The supplemental petition shall be filed *by the social worker* in the original matter and shall contain a concise statement of the facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child or, in the case of a placement with a relative, sufficient to show that the placement is not appropriate in view of the criteria in Section 361.3."  (Italics added.)

" 'Supplemental' petitions [under section 387] are filed if the social worker determines the previous disposition order has not been effective and it is necessary to remove 'the child from the physical custody of a parent, guardian, relative, or friend and direct[] placement in a foster home, or commitment to a private or county institution. . . .' [Citations.]  In each instance, the social worker initiates proceedings by the filing of a petition."  (*Victoria C.*, *supra*, 100 Cal.App.4th at pp. 542-543.)

In a section 387 proceeding, "the court applies the procedures and protections of section 361."  (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.)  "In proceedings on a

12

supplemental petition, a bifurcated hearing is required. [Citations.] In the first phase of a section 387 proceeding, the court must follow the procedures relating to a jurisdictional hearing on a section 300 petition . . . . [Citation.] At the conclusion of this so-called 'jurisdictional phase' of the section 387 hearing [citation], the juvenile court is required to make findings whether: (1) the factual allegation of the supplemental petition are or are not true; and (2) the allegations that the previous disposition has not been effective in protecting the child is, or is not, true. [Citation.] If both allegations are found to be true, a separate 'dispositional' hearing must be conducted under the procedures applicable to the original disposition hearing." (*In re Jonique W.* (1994) 26 Cal.App.4th 685, 691.)

Sandra relies on *Jessica C.*, *supra*, 151 Cal.App.4th 474. The issue in *Jessica C.*, however, was whether section 387 or section 388 applied to the *child protective agency's* petition to terminate a grandfather's guardianship, because of his declining health and the grandmother's death, and place the children in foster care. *Jessica C.* held that "[a]lthough the statutory scheme allows for using section 388 to seek termination of a guardianship established as a permanent plan (§ 366.3, subd. (b)), section 387 is the appropriate procedural mechanism *if* the termination will result in foster care." (*Jessica C.*, at p. 482.)[6]

---

[6] *Jessica C.* explained: "The legislative policy in California is that foster care should only be used as a temporary method of care. [Citation.] In addition, reunification with the natural parents or another alternative permanent living situation such as adoption or guardianship is more suitable to a child's well-being than is foster care. [Citation.] We believe it is for this reason that the Legislature established a more structured procedure when efforts are made to terminate a guardianship in favor of foster care. Consequently, the decision to remove a dependent child from the home of a relative

13

" '[I]f the statutory language is not ambiguous, then we presume the Legislature meant what it said, and the plain meaning of the language governs.' " (*In re Austin P.* (2004) 118 Cal.App.4th 1124, 1129.)  "[W]e do not rewrite the clear language of [a] statute to broaden the statute's application." (*In re David* (2012) 202 Cal.App.4th 675, 682.)  The language of section 387 is unambiguous, and Sandra does not contend otherwise.  Her trial counsel conceded that only a social worker may file a supplemental petition under section 387.

The court rejected the notion that only the Agency could petition for termination of Sandra's guardianship, noting "sometimes the Agency is just flat out wrong."  In determining it could proceed under section 388, the court relied on *Victoria C.*, in which the father filed a section 388 petition to seek removal of the minor from the mother's custody.  The father did not request custody, and presumably there was a potential for foster care placement.  County counsel opposed the petition on the ground only the social worker could petition for removal, under section 387, and the juvenile court agreed. (*Victoria C.*, *supra*, 100 Cal.App.4th at p. 541.)

On appeal, county counsel changed its position and agreed the juvenile court erred by summarily dismissing the section 388 petition.  (*Victoria C.*, *supra*, 100 Cal.App.4th at p. 542.)  The appellate court concluded a section 388 petition "was an appropriate procedural vehicle to seek removal of the minor from the mother's custody, and the juvenile court erred by concluding otherwise."  (*Id.* at p. 543.)  *Victoria C.* explains:  "[A]

caretaker who has assumed the role of de facto parent for several years cannot be made lightly." (*Jessica C.*, *supra*, 151 Cal.App.4th at pp. 481-482.)

14

broad interpretation of the statutory language comports with the purpose of section 388. [Citations.] It appears the only difference between a request for removal of a child from a parental home and any other order is a more stringent burden of proof: a request for removal from a parental home, or to a 'more restrictive placement,' requires clear and convincing evidence that grounds for removal exist." (*Ibid*.) We find *Victoria C.* persuasive.

We are also persuaded by rule 5.560(e), which provides: "A petition for modification hearing [under section 388] may be filed by: [¶] (1) The probation officer, the parent, the guardian, the child, the attorney for the child, or any other person having an interest in a child who is a ward *if the requested modification is not for a more restrictive level of custody*; [¶] (2) The social worker, regarding a child who is a dependent, *if the requested modification is not for a more restrictive level of custody*; or [¶] (3) The parent, guardian, the child, the attorney for the child, or any other person having an interest in a child who is a dependent." (Italics added.)

" 'The usual rules of statutory construction are applicable to the interpretation of the California Rules of Court.' " (*Crespin v. Shewry* (2004) 125 Cal.App.4th 259, 265.) " ' "Where a statute on a particular subject omits a particular provision, the inclusion of such a provision in another statute concerning a related matter indicates an intent that the provision is not applicable to the statute from which it was omitted." ' " (*In re Gerald J.* (1991) 1 Cal.App.4th 1180, 1186.) The omission of the phrase "if the requested modification is not for a more restrictive level of custody" from the third subsection of rule 5.560(e) indicates that a *parent* may use section 388 to request a more restrictive

15

level of custody, such as foster care. We conclude the court properly considered D.S.'s petitions for modification under section 388.

B

Sandra contends the use of section 388 was prejudicial because it "deprived [her] of the more stringent standards for removal found in . . . section 387." She cites section 361, subdivision (c)(1), which applies in a section 387 proceeding, and prohibits the removal of a child from his or her guardian unless it finds by clear and convincing evidence that there are no reasonable means by which the child can be protected without removal. She adds, "Section 388 imposes no requirement that a reasonable means analysis be done as a condition of removal."

" 'When the trial court commits error in ruling on matters relating to pleadings, procedures, or other preliminary matters, reversal can generally be predicated thereon only if the appellant can show resulting prejudice, and the probability of a more favorable outcome.' " (*Buckner v. Milwaukee Electric Tool Corporation* (2013) 222 Cal.App.4th 522, 539.) As discussed, the court did not err by proceeding under section 388. Further, Sandra ignores that the court did undertake a reasonable means analysis and it applied a heightened burden of proof. The court explained: "I have carefully thought [about] whether the children can remain in the home[,] . . . while, for instance, [Sandra's] services are being put in place, but I find that continued care in the home of the guardian is contrary to the children's welfare. [¶] I am placing responsibility for detention out of home with the . . . Agency, and I do find by clear and convincing evidence there are no

16

services today which would prevent the need for detention out of home."  The outcome would not have been more favorable in a section 387 proceeding.

Additionally, Sandra asserts she received inadequate notice because the section 388 petitions sought return of the children to D.S.'s custody rather than their placement in foster care.  She submits that she could not "reasonably anticipate" that Jamie and Elijah might be detained in foster care.  We are not persuaded.  The petitions naturally put Sandra on notice of the potential for foster care detainment should D.S. establish they were at risk of harm in Sandra's home, but not establish they could be safely returned to D.S.'s custody.  Further, Sandra ignores that at an April 4, 2014, conference on procedural matters, the court stated the section 388 petition "is in two parts.  One is to dissolve the guardianship, and the second is to place with mother."  The court advised the parties they "need to be ready" to discuss placement in the event the court were to remove the children from Sandra's home before it considered D.S.'s custody request.  The court stated, "I assume that there may be an emergency issue that we will have to address.  So all the parties should be prepared."

"[D]ue process requires 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " (*In re Melinda J.* (1991) 234 Cal.App.3d 1413, 1418.)  The court rejected the argument Sandra's due process rights were infringed, and we agree.  She had adequate notice and fully participated in the proceedings.

Sandra also asserts that instead of filing a section 388 petition, D.S. should have enlisted the Agency's assistance under section 329.  Section 329 provides in part:

17

"Whenever any person applies to the social worker to commence proceedings in the juvenile court, the application shall be in the form of an affidavit alleging that there was or is . . . a child within the provisions of Section 300, and setting forth facts in support thereof.  The social worker shall immediately investigate as he or she deems necessary to determine whether proceedings in the juvenile court should be commenced."

Because D.S. properly moved under section 388, we need not consider whether she had an additional remedy under section 329.  (*Victoria C.*, *supra*, 100 Cal.App.4th at p. 545.)  Further, a section 329 application would have been fruitless, because even after the presentation of D.S.'s evidence the Agency argued the children should be left in Sandra's care.  The court explained a section 329 investigation would only cause needless delay, as the "Agency has had ample time to confer and decide what its position would be."

## II

### *Changed Circumstances/New Evidence*

Sandra also contends the court erred by finding changed circumstances or new evidence sufficient to sustain a section 388 petition.  "We review the grant or denial of a petition for modification under section 388 for abuse of discretion."  (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228.)  " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court. ' "  (*In re Stephanie M* (1994) 7 Cal.4th 295, 318-319.)

18

Sandra asserts the court should not have considered the evidence of physical abuse in determining whether there were changed circumstances, because D.S.'s petitions alleged physical abuse only under the best interests prong. We disagree. Question seven on the JV-180 form asked, "What changed after the judge's order that would change the judge's mind? (*Give new information that the judge did not have when the order was made.*)" D.S. responded, "SEE ATTACHED EXHIBITS." Three of the exhibits were declarations that pertained to physical abuse. At a hearing on whether D.S.'s original petition made a prima facie showing, Sandra's counsel conceded the exhibits "show a change of circumstances as to whether the court should terminate the letters of guardianship."[7] The body of the petitions focused on D.S.'s situation, which is understandable since she sought to regain custody of Jamie and Elijah.

Additionally, Sandra asserts D.S. "could not claim that Sandra's strict parenting style, including the use of physical punishment, was new evidence to her." Sandra cites *H.S.*, *supra*, 188 Cal.App.4th 103, which held "the term 'new evidence' in section 388 means material evidence that, with due diligence, the party could not have presented at the dependency proceeding at which the order, sought to be modified or set aside, was entered." (*Id.* at p. 105.)

Sandra's guardianship was established in March 2012. She cites D.S.'s testimony that she moved to Ohio in July 2011, and she stayed with Sandra for about two weeks. Jamie told D.S. she "got a whooping for peeing in her bed," and Michell told D.S. that

---

7       The court's eventual exclusion of the exhibits is immaterial.

19

Sandra "busted her lip." D.S. was asked, "Do you know if any physical discipline was occurring in [Sandra's] house before you went to go stay with her?" D.S. responded, "Well, all of my life I have known my auntie, and I know that she hits kids inappropriately. So to answer your question, yes. I did know that she was kind of physically abusive, *I just didn't know to what extent that she would go*." (Italics added.) D.S. added, "I just knew that . . . you have to walk a straight line with her."

Sandra claims D.S. could "have presented her allegation and evidence of physical punishment at or before the dependency proceeding conducted when the guardianship order was made." We conclude, however, that the testimony of Mitchell, Michell, C.S. and A.M. regarding the types and extent of Sandra's physical abuse, including forced squatting, punches to the chest, beatings with electrical cords, and the infliction of physical injuries, was substantively different from the abuse to which D.S. testified, and thus it qualifies as "new evidence" under section 388. (See *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1039-1040.)[8]

Additionally, the court explained that when it established the guardianship, Sandra's conduct "was *completely* unknown to the court." (Italics added.) We have observed that "[t]he juvenile court must be able to consider the most complete and most

----

[8]     In *In re Jessica C.*, *supra*, 93 Cal.App.4th 1027, the juvenile court determined that sexual abuse allegations in a section 388 petition were unproven. A second petition was filed, which contained new sexual abuse allegations. On appeal, the father claimed the second petition attempted to relitigate the same claims as the original petition. The appellate court disagreed and stated, "New disclosures of child abuse, *substantively different from previous disclosures, do constitute new evidence*." (*Id*. at p. 1039, italics added.)

pertinent information about a child's welfare in determining how best to protect that child. Whether the information could have been presented earlier if the party seeking modification had conducted a reasonably diligent investigation does not alter this basic precept." (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 109, fn. 14.) Dependency law is intended to provide "maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) "One section of the dependency law may not be considered in a vacuum. It must be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect." (*In re Marilyn H.*, 5 Cal.4th 295, 307.) Jamie and Elijah were at risk of harm in Sandra's home, and interpreting the term "new evidence" in section 388 as including physical abuse not previously revealed by the witnesses comports with the purpose of dependency law. We find no abuse of discretion.[9]

---

[9] Sandra ignores that D.S. presented new evidence pertaining to her chronic marijuana smoking. Sandra does not contend her drug use, standing alone, was an insufficient ground to remove Jamie and Elijah from her custody and terminate the guardianship.

DISPOSITION

The order is affirmed.


                                                    McDONALD, J.

WE CONCUR:


NARES, Acting P. J.


McINTYRE, J.