Filed 12/16/14  In re H.G. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re H.G.,<br><br>a Person Coming Under the Juvenile Court Law. | B254166<br>(Los Angeles County<br> Super. Ct. No. CK91100) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>H.G.,<br><br>    Defendant and Appellant. | |

APPEAL from an order of the Superior Court for Los Angeles County, Timothy R. Saito, Judge.  Affirmed.

Andre F. F. Toscano, under appointment by the Court of Appeal for Appellant.

Janette Freeman Cochran, under appointment by the Court of Appeal for Respondent S.P.

H.G., a dependent child of the juvenile court, appeals from the juvenile court's disposition order granting family reunification services to his mother, S.P. (mother). He argues that there was not clear and convincing evidence that it was in his best interests to grant mother reunification services, and that it was detrimental to reunify him with mother. Mother[1] contends that substantial evidence supports the court's finding that the reunification bypass provision set forth in Welfare and Institutions Code[2] section 361.5, subdivision (b)(10) did not apply, and that granting reunification services to mother was in H.G.'s best interest. Mother is correct. Accordingly, we affirm the juvenile court's order.

## BACKGROUND

At the time of H.G.'s birth in June 2013, mother had six children ranging in age from 14 to one and a half years old. The three oldest children were prior dependents of the juvenile court, and were reunified with their father, Aaron W.; the three youngest were currently dependents of the juvenile court due to mother's drug use and unresolved domestic violence issues. When H.G. was two weeks old, mother went to the office of the social worker assigned to the dependency case involving her other children, to inform the worker that she had enrolled in the programs the court had ordered mother to attend in that case. Mother also reported that she had enrolled in the Department of Mental Health (DMH) Women Integrated program, and she was living in a shelter, Fresh Start New Images (Fresh Start). She provided the social worker with her current address and phone number, proof of her enrollment in domestic violence and anger management programs, and

---

[1] The Los Angeles County Department of Children and Family Services (the Department) informed this Court that it would not file a respondent's brief in this case.

[2] Further undesignated statutory references are to the Welfare and Institutions Code.

2

contact information for her case manager. The social worker contacted the case manager, and confirmed that mother enrolled in the program on June 7, 2013 and got a placement in the shelter three days later.

The social worker told mother about the status of her current open case with H.G.'s siblings. The worker explained that family reunification services with respect to the siblings had been terminated, and the children were in a permanent plan with relatives. The worker attempted to obtain mother's consent to detain H.G., but mother declined. A referral was called into the child protection hotline to report mother's new child.

Later that same day, the social worker went to Fresh Start to verify that mother resided there and to assess whether the placement was appropriate for the child. The worker observed that mother's room was well organized and neat, and that mother had a basinet, a playpen, a car seat, and plenty of clothes for the child. Mother reported that the child's father is William G., and that she and William were not currently in a relationship, although William had come to the shelter to visit the child and he cares about the child.[3] Mother did not know where William was living, and she only had his phone number.

The Department obtained a removal order for H.G., and tried unsuccessfully over several days to enforce it, but could not locate the child. A week later, on July 18, 2013, William brought the child to the Department's office. William told the social worker that he would be willing to care for the child if the court released the child to him, but the worker told him the Department would have to assess before releasing the child to him because the court had recently terminated family reunification services for him with regard to his son, H.G.'s older sibling, J.T. (one of mother's children). William provided the worker with his current address and

---

[3]    William could not be located by the Department and is not a party to this appeal. Therefore, our discussion of the facts will address only those facts relevant to mother.

phone number. When the social worker called that phone number later that night and again the next day, the outgoing voice on the voicemail was female. The worker left a voicemail message, but was not sure if William received it.

On July 23, 2013, the Department filed a petition under section 300, subdivisions (b) and (j), alleging four counts. Counts b-1 and j-1 allege that mother has a history of illicit drug abuse that renders her incapable of providing regular care and supervision of the child, that she failed to comply with juvenile court orders to participate in a substance abuse program and drug testing, and that the child's siblings are dependents of the juvenile court due to mother's drug abuse. Counts b-2 and j-2 allege that mother has an unresolved history of engaging in physical altercations with her male companions, that she failed to comply with juvenile court orders to participate in anger management and counseling, and that the child's siblings are dependents of the juvenile court due to mother's unresolved domestic violence issues.

In the detention report filed in advance of the detention hearing, the Department reported on the circumstances surrounding the removal of H.G. from mother's care, and noted mother's criminal record (as of November 15, 2011), which included convictions for robbery, DUI, and driving with a suspended license. At the detention hearing, the juvenile court found there was a prima facie case for detaining H.G. from mother, and ordered H.G. detained in shelter care.

In the adjudication report filed on September 11, 2013, the Department reported on interviews conducted with mother in September 2013 and January 2012. In January 2012, mother stated that she had been in a drug program for a year in 2008 until February 18, 2009, and the first time she smoked marijuana after that was the day she went into labor with H.G.'s sibling, J.T.; she said she smoked because she was stressed out. In her September 2013 interview, mother said she smoked marijuana one time when she was pregnant with J.T., and has not smoked

4

in almost two years. Before that, she smoked marijuana once a week for seven months, and experimented twice with "powder" in 2004 or 2005. She used to drink beer every day, but did not drink while she was pregnant. After the Department took H.G., she drank liquor all week. With regard to the domestic violence allegations, mother denied engaging in domestic violence. She admitted, however, that she got into an altercation with a former male companion while she was pregnant with J.T., although she said they did not hit each other and only broke a lamp and some pictures. She also admitted that another male companion broke her jaw (for which he went to jail), and that her three oldest children live with their father.

The Department also reported that mother currently was "in jail for the charge 'accessory to an attempted robbery,'" and had been incarcerated since July 30, 2013. No further details regarding the crime or the incarceration were provided. The Department also reported that mother said she has a history of mental illness and has been diagnosed with "Bipolar, Manic Depression." She said that she did not want to participate in treatment or take any psychotropic medication.

Finally, the Department reported that in October 2012, mother was ordered by the juvenile court to participate in individual counseling, parenting, alcohol counseling, random alcohol testing, drug counseling and anger management classes, but had not completed any of those programs. The Department also noted that mother has not contacted the Department regarding H.G.'s sibling J.T., or to inquire about H.G.'s well-being, and has not attended prior court hearings. Therefore, the Department requested that no reunification services be offered to mother under section 361.5, subdivision (b)(10).

On October 18, 2013, the juvenile court terminated reunification services for mother with respect to H.G.'s three siblings at the 12-month review hearing in their

case, finding that mother (and those children's fathers) "have not consistently and regularly contacted and visited with the child(ren), that they have not made significant progress in resolving the problems that led to the child(ren)'s removal from the home, and that they have not demonstrated the capacity and ability both to complete the objectives of the treatment plan and to provide for the child(ren)'s safety, protection, physical and emotional well-being, and special needs."

Four days later, the adjudication hearing was held with regard to H.G. Mother was present, in custody. Mother testified that she has not smoked marijuana in a couple of years, and did not use any kind of illicit drug while she was pregnant with H.G. She said that she received prenatal care while pregnant, had a normal pregnancy, and that H.G. was born within the normal gestation period, without any complications. After H.G. was released to her, she took him with her to Fresh Start, which she described as a "mental health reintegration program for women." Her mental health worker provided her with everything she needed for the baby.

Mother explained that when she got pregnant with H.G., she "changed [her] ways." She started to look for a place to live and enrolled in the DMH program at Fresh Start, which included parenting, anger management, domestic violence, and individual counseling. The program also would do drug testing. She felt that she was benefitting from the program.

Mother's counsel argued that the petition should be dismissed, because the petition is based solely on mother's past, and her testimony showed that she has made a break from that past. The juvenile court sustained the petition, finding that H.G. is a child described under section 300. The court stated it "believe[d] mother is committed to this child based on her testimony, but . . . the historical posture of this case is that she hasn't addressed any of the issues that brought this matter to the court. [¶] As indicated, it is fairly recent with regards to her issues in this case.

6

And from her testimony, as well as from the documents that were presented in this case, she hasn't really addressed any of these issues."

The disposition hearing was scheduled to be held on November 21, 2013, but mother was not brought in from local custody; she had been transferred to state prison. Therefore, the hearing was continued to January 17, 2014. At that hearing, Mother's counsel offered mother's stipulated testimony. Counsel stated that if mother were called to testify, she would testify that her release date is July 24, 2015. She has placed herself on a wait list for reentry programs at her place of incarceration, and once she is off the wait list she will be able to participate in a full substance abuse program.

The Department asked that no reunification services be given to mother under section 361.5, subdivision (b)(10) because reunification services were terminated for her other children after receiving 22 months of services, and she is not scheduled to be released from prison until July 2015. Counsel for H.G. agreed with the Department's recommendation, and noted that in October 2013, the court had found that mother's progress over those 22 months of services had been very minimal. Counsel for mother asked the court to grant reunification services, noting that mother is in custody on a non-drug-related incident, and she has made some efforts towards alleviating the concerns that resulted in termination of services as to the other children. Counsel also noted that her scheduled release date is only two years from the date of H.G.'s detention, and she argued that it would not be detrimental to H.G. to offer mother at least a six-month period of reunification to see if she is able to follow through with her programs at her site of incarceration.

The juvenile court declared H.G. a dependent child of the court and removed him from his parents' custody. Addressing the issue of reunification services, the court noted that mother is "trying to make an effort in this case to change herself with regards to [H.G.]," but the court expressed concerns about the length of her

7

incarceration. The court asked her counsel if she had any information about good time/work time; counsel said she only had the official release date mother was given, but that time off was always a possibility. The court then stated: "In this case I'm going to take that into consideration and the fact that mother is trying to turn around in this case and make an effort. The child is young. [¶] I'm going to see what she can do. And I'm going to grant her reunification services in the best interest of the child based on her efforts to try to get into her program, her prior testimony, the age of the child. The court finds by clear and convincing evidence that reunification services will be granted." The court ordered mother to participate in a full drug program with testing, anger management, parenting, and individual counseling to address case issues.

H.G. timely filed a notice of appeal from the disposition order granting reunification services.

## DISCUSSION

"On removal of a child from parental custody, the juvenile court generally must order reunification services to assist the parent to rectify the problems that led to removal. [Citations.] 'This requirement implements the law's strong preference for maintaining the family relationship if at all possible.' [Citation.] Section 361.5, subdivision (b), however, sets forth certain narrowly specified exceptions – referred to as 'reunification bypass provisions' – to the general mandate of services. The exceptions are subject to a clear and convincing standard of proof. [Citations.]" (*In re Lana S.* (2012) 207 Cal.App.4th 94, 106.) The party seeking bypass of reunification services has the burden of proving that the exception applies. (*In re Angelique C.* (2003) 113 Cal.App.4th 509, 521.)

"Under most of the exceptions, the juvenile court 'shall not' order reunification services unless it finds, by clear and convincing evidence, that

8

reunification is in the best interests of the child.  (§ 361.5, subd. (c).)  Thus, "'[o]nce it is determined one of the situations outlined in subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources.  [Citation.]'" [Citation.]  The burden is on the parent to change that assumption and show that reunification would serve the best interests of the child."  (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227.)

In this case, H.G. contends on appeal that there was not clear and convincing evidence that it was in H.G.'s best interests to grant mother reunification services.  He argues that "[t]he juvenile court erred in granting reunification services to Mother as to H.G. despite finding that an exception to granting the services applied to this case and despite clear detriment to H.G. if the services were offered."  H.G. misreads the record.  The juvenile court in this case did *not* find the exception applied.

The exception at issue here is found in section 361.5, subdivision (b)(10). Under that provision, reunification services may be denied when a parent's reunification services with respect to a child's sibling or half sibling have been terminated in earlier proceedings, and the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling."  (§ 361.5, subd. (b)(10).)

There is no question that the first part of the exception applies.  The undisputed evidence is that reunification services were terminated as to three of H.G.'s siblings or half siblings.  But the juvenile court did not make the second finding required for the exception to apply.  Instead, the court found, based upon substantial evidence -- mother's stipulated testimony that she was trying to get into programs while incarcerated and her prior testimony that she had enrolled in programs at Fresh Start -- that mother *had* made a reasonable effort to treat the

9

problems that led to removal of her other children. As one court has noted, "[t]he reasonable effort requirement focuses on the extent of a parent's efforts, not whether he or she has attained 'a certain level of progress.' [Citation.] 'To be reasonable, the parent's efforts must be more than "lackadaisical or half-hearted."' [Citation.] However, '[t]he "reasonable effort to treat" standard "is not synonymous with 'cure.'"' [Citation.]" (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914.)

Because the juvenile court did not find that section 361.5, subdivision (b)(10) applied, the general rule favoring reunification still applied to the case, and mother did not have the burden under section 361.5, subdivision (c), to show that reunification was in the best interests of her child.

H.G. argues, however, that under section 361.5, subdivision (e)(1), the juvenile court should have denied reunification services because mother was incarcerated and services would be detrimental to H.G. That subdivision provides, in relevant part: "If the parent . . . is incarcerated, . . . the court shall order reasonable services unless the court determines, by clear and convincing evidence, those services would be detrimental to the child. In determining detriment, the court shall consider the age of the child, the degree of parent-child bonding, the length of the sentence, . . . the nature of the crime . . . , the degree of detriment to the child if services are not offered . . . , the likelihood of the parent's discharge from incarceration . . . within the reunification time limitations described in subdivision (a), and any other appropriate factors."

"Section 361.5, subdivision (e)(1) does not require that each listed factor exist in any particular case, nor does it specify how much weight is to be given to a factor bearing on detriment, listed or not." (*Edgar O. v. Superior Court* (2000) 84 Cal.App.4th 13, 18.) In this case, the juvenile court took into consideration H.G.'s young age and the length of mother's sentence, including the possibility that she

might be released before her official release date, and concluded it would be in H.G.'s best interest to offer mother six months of reunification services to see what mother could do in that time. In other words, the court concluded there was not clear and convincing evidence that offering reunification services would be detrimental to H.G. We find no reason to disturb the juvenile court's ruling.

**DISPOSITION**

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.

MANELLA, J.

11