Filed 7/27/15  In re J.G. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.G. et al., Persons Coming Under the Juvenile Court Law. | H041499 (Santa Clara County Super. Ct. Nos. 114JD22654 & 114JD22655) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> C.O., <br><br> Defendant and Appellant. | |

Cindy O., the mother of J. and X., appeals from orders declaring them to be dependents of the juvenile court pursuant to Welfare and Institutions Code section 300.[1] The mother contends:  (1) there was insufficient evidence to support the juvenile court's determination that her sons were described in section 300, subdivision (b); and (2) the juvenile court erred by removing X. from her custody.[2]  We affirm.

---

[1]     All further statutory references are to the Welfare and Institutions Code.
[2]     J.G., Sr., (J.G.) is the presumed father of J.  R.M. is the presumed father of X. Neither father is a party to the present appeal.

## I. Procedural and Factual Background

On June 16, 2014, the Santa Clara County Department of Family and Children's Services (Department) filed petitions alleging that 12-year-old J. and three-year-old X. came within the provisions of section 300, subdivisions (b) [failure to protect] and (g) [no provision for support]. The petition alleged: on June 12, 2014, the police executed a search warrant at the residence of the mother and R.M.; the police found methamphetamine and drug paraphernalia in the mother's room and methamphetamine, cocaine, marijuana, scales, and guns in the garage where R.M. slept; the drugs and drug paraphernalia in both locations were accessible to the children; the mother and R.M. were arrested for possession of methamphetamine and child endangerment; J. and X. were placed into protective custody.

Three days before the petition was filed, the social worker met with the children. J. stated that he lived with his mother, grandmother, uncle, and his brother's father R.M. According to J., R.M. is a " 'shady guy' " and when R.M. is around "he gets a bad feeling in his stomach." J. did not disclose violence in the home. He also stated that he did not believe that his mother used drugs and he had not seen drugs in the home. J. had recently begun visiting his father. He stated that he would be scared to live with his father, but could not explain why.

About a month later, the petitions as to both children were amended to include the following allegations: there were scales and cocaine, which were accessible to the children, in the mother's room; the mother had an untreated substance abuse problem; and the mother had pending criminal charges for child cruelty, possible injury to a child, and possession of drug paraphernalia. The petition as to X. included additional allegations: R.M. had an untreated substance abuse problem; R.M.'s criminal history included weapon and drug offenses; and R.M. had pending criminal charges for child

2

cruelty; possible/injury death; possession for sale of controlled substances; and carrying a concealed dirk or dagger.

The jurisdiction/disposition report was prepared on July 23, 2014. The social worker recommended that the first amended petition be sustained as to both children, family reunification services be ordered for the mother and R.M., the dependency be dismissed for J., and J.G. be awarded custody of J.

The social worker provided information from the police report. When they executed the search warrant, the police found a digital scale, unused packaging material, approximately 1.26 grams of cocaine, .90 grams of methamphetamine, and other drug paraphernalia in the garage where R.M. slept. They found .30 grams of methamphetamine in the nightstand drawer, unused packaging material, a digital scale, a methamphetamine pipe, a pay/owe sheet, .14 grams of methamphetamine in a container in the closet, a baggie with a suspected cutting agent, and a baggie containing .25 grams of cocaine in the mother's bedroom. According to the police, the drugs located in the garage and the bedroom were accessible to the children. They also noted that the children's clothes were found in the same area in which the drugs were located.

The social worker met with the mother, who had been released from jail. The mother stated that the drugs in the room belonged to her and that she was not selling drugs. She also stated that she began using methamphetamine about eight months ago, she was hardly ever home, and she locked her room when she left. She and R.M. used to share the room, but he moved into the garage after they separated. According to the mother, she stopped using drugs when her sons were placed into foster care. The mother was willing to participate in programs in order to reunite with them.

The social worker had not yet received the drug assessment report on the mother. The mother had been referred to the deferred entry of judgment program and ordered to

complete 30 hours of community service. Her criminal charges remained pending until she completed the program requirements.

Both children were placed in a foster home, but they often spent the night at J.G.'s home. The mother had supervised visitation two to three times a week for four hours. The maternal uncle and the maternal grandmother supervised the visits.

An addendum report was prepared on September 9, 2014. Though all visits between the children and the mother were to be supervised, the mother had taken the children to J.G.'s house without supervision. The mother spoke negatively about J.G. in her children's presence even after the social worker told her to stop. The social worker also told the mother that she needed to maintain contact with her. However, when the social worker subsequently called her and e-mailed her, she did not receive a response. The mother had not communicated with the social worker since August 8, 2014.

The social worker spoke with J., who stated that he wanted to live with his mother and did not want to live with his father.

The social worker met with R.M., who told her that he did not want X. returned to the mother's care. He explained that X.'s uncle took care of X. during the day and R.M. took care of him during the evening. R.M. stated that both he and the mother used and sold drugs. However, he "took the blame for the entire crime," because he thought he would go to prison and lose his parental rights. Since he had a chance to reunite with his son, he wanted to be honest. According to R.M., the mother and her family knew he was selling drugs, because there were several people coming in and out of the house. He also gave the money from the drug sales to the mother or to the maternal grandmother. R.M. also stated that the mother has been using methamphetamine for the past three or four years and did not breastfeed X. because she was using methamphetamine. The mother's current boyfriend is "just like" R.M. and would try to take R.M.'s clientele when he was selling drugs. R.M. told the social worker that the mother was "hardly ever home," and

4

sometimes would leave for three or four days at a time. According to R.M., both J. and X. ate cereal for lunch and dinner. They also would be left alone in the living room while the adults were in their own rooms. The maternal family would leave X. in a dirty diaper for extended periods and wait for R.M. to return home so that he could change it. They also made negative comments about J.G. in J.'s presence.

The social worker had referred the mother to outpatient treatment at Pathway South County and encouraged her to attend a 12-step program. The treatment status report, dated September 4, 2014, indicated that the mother had been attending outpatient treatment on a regular basis. The mother submitted to drug testing on four occasions. One result was pending and three results were negative. However, the mother had missed five drug tests.

A second addendum report was prepared on September 23, 2014. J.G. had provided the social worker with text messages that he had copied from J.'s cell phone. J.G. was concerned with the mother's use of profanity in communicating with J. In one text exchange J. told his mother that she had been gone for five hours, and she responded: "Dud I was fucken busy sol fucken chill dud. Dnt fckn tell rirro [his uncle] or mami [his grandmother] I got home late." In another text, she told J. that the "Cops" came to check on [R.M.] and she wanted J. to text him to find out "wat d fuck is going on." She also told J. to tell people that she was not in the room, she was doing hours for welfare, and not to say anything bad about her. On another occasion, J. texted his mother that he was in trouble, because she kept texting him while he was in class. In response, the mother continued to tell him about her relationship with her boyfriend and told him to put his phone on silent.

Though the social worker had left several messages with the maternal relatives for the mother to call her, she had not heard from the mother since August 8, 2014. The mother did not submit to drug testing between August 21 and September 22, 2014.

5

The social worker also provided information about J.'s glasses. In mid-June 2014, the social worker had delegated the responsibility to find J.'s glasses to the mother. The mother eventually ordered prescription glasses for J. However, the glasses that she obtained were not the correct prescription. J.G. took J. to an optometrist and obtained glasses for J.

On September 12, 2014, the contested jurisdiction and disposition hearing began. The jurisdiction/disposition report and the addendum report were admitted into evidence. Melanie R., the mother's 14-year-old stepcousin, testified that she lived with the mother for less than a month before the police executed the search warrant. There was a lock on the mother's bedroom door and Melanie never saw X. or J. enter their mother's room. Melanie initially testified that X. and J. were able to go into the garage, but they did not enter it. However, she later testified that J. once entered the garage to get paper towels and X. once slept with R.M. in the garage. Melanie never noticed that the children were in physical danger or hungry. She never saw strange people coming in and out of the house and she never felt afraid in the house. She also never saw drugs and alcohol in the house. According to Melanie, the mother frequently left the house during the night while the children slept and returned early in the morning.

Rosa R., Melanie's mother, testified that she lived with the mother for about two months. Rosa R. left the house for work at around 6:30 a.m. and would return between 3:30 p.m. and 5:00 p.m. Rosa R. also worked weekends. She never saw X. or J. enter their mother's room, because the door was locked. She also confirmed that the mother went out at night, but she could not say how often. She saw the children in the garage twice. Rosa R. never saw anything related to drugs in the house.

Two weeks later, the continued hearing was held. The second addendum report and documentation of the mother's charges were admitted into evidence. The mother had pleaded guilty to child cruelty, possible injury to a child, and possession of a controlled

6

substance. After amending the dependency petitions to conform to the charges listed in the deferred entry of judgment and striking the section 300, subdivision (g) allegations, the juvenile court sustained the petitions under section 300, subdivision (b).

The hearing continued on dispositional issues. J.G. authenticated some text messages that the mother had sent to J. and the transcripts of these messages were introduced into evidence.

Anne Marie Cleveland, a social worker, testified as an expert in risk assessment and the development of case plans for dependency court. Cleveland had reviewed the text messages that the mother had sent to J. Cleveland expressed several concerns about these texts: the mother was coaching J. to not say anything negative about her; she was discussing her relationship with her boyfriend; she was texting him while he was in school; she was using profanity; and she was coaching him to hide information from her family. Cleveland also testified that the mother had not been in contact with the Department between August 8 and September 25, 2014. Though Cleveland had tried to reach the mother several times, the mother had never responded. The mother had not been submitting to drug tests, and thus Cleveland did not know if she was clean and sober. The social worker also did not know if the mother was participating in any programs or classes.

Cleveland was also concerned that the mother was interfering with the relationship between J.G. and J. After the children were placed with J.G., the mother began making accusations that J.G. was drinking and using drugs. The mother also referred to J.'s stepmother as a "bitch."

Cleveland testified that J. did not want to live with J.G. and preferred to live with his maternal grandmother. J. had an attachment to the mother and had said that he really wished that he could go home, where his mother resided.

7

The juvenile court admitted into evidence a letter written by J. in which he expressed his desire to live with his maternal grandmother while his mother recovered. J. testified briefly and stated that "home" to him was his grandmother's house.

Following argument, the juvenile court ordered joint legal custody of J. to the mother and J.G., physical custody to J.G., supervised visitation to the mother, and dismissed the case. The juvenile court ordered the removal of X. from the custody of the mother and R.M. and reunification services to both parents.

## II. Discussion

The mother contends that the juvenile court erred in asserting jurisdiction over J. and X. under section 300, subdivision (b), because there was insufficient evidence that there was a substantial risk of serious harm to the children at the time of the jurisdiction hearing.

In order to exercise its jurisdiction over a child in a dependency case, the juvenile court must find that the child is a person described by one or more of the section 300 subdivisions. (*In re Michael D.* (1996) 51 Cal.App.4th 1074, 1082.) Section 300, subdivision (b) provides in relevant part: "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . . The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." A finding of substantial risk requires a showing that, at the time of the jurisdiction hearing, the child is at risk of future harm. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396.) However, "[t]he court may consider past events in deciding whether a child presently needs the court's protection. [Citation.] A parent's '"[p]ast conduct may be

8

probative of current conditions" if there is reason to believe that the conduct will continue.' [Citation.]" (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1216.)

"Section 300 jurisdiction hearings require a preponderance of the evidence as the standard of proof. (§ 355, subd. (a).) In reviewing the sufficiency of the evidence on appeal, we look to the entire record for substantial evidence to support the findings of the juvenile court. We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Instead, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding. [Citations.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the order. [Citations.]" (*In re A.M.* (2010) 187 Cal.App.4th 1380, 1387-1388.)

The mother concedes that there was substantial evidence that she had substance abuse issues, but she argues that there was insufficient evidence that these issues had any impact on her ability to parent J. and X. or placed them at risk of harm. She relies on *In re David M.* (2005) 134 Cal.App.4th 822 (*David M.*) and *In re James R.* (2009) 176 Cal.App.4th 129 (*James R.*) to support her position.

*David M.*, *supra*, 134 Cal.App.4th 822 held that the record did not support jurisdictional findings under section 300, subdivision (b). (*David M.*, at p. 825.) In that case, two-year-old David and two-day-old A. were removed from their parents' custody. The mother had used marijuana on at least one occasion during her pregnancy with A. and failed to obtain prenatal care early in this pregnancy, but A. tested negative for drugs at birth. (*Id.* at p. 826.) The mother had been diagnosed as delusional three years prior to the dependency proceeding due to her history of marijuana use. (*Ibid.*) The father had been diagnosed with social and anxiety disorder and depression. (*Id.* at p. 827.) *David M.* also noted that David was "healthy, well cared for, and loved, and that mother

9

and father were raising him in a clean, tidy home" and that the mother tested negative for drugs approximately 18 times between the detention hearing and the jurisdiction hearing. (*Id.* at p. 830.) There was also no evidence that David was exposed to drugs or drug paraphernalia. (*Id.* at p. 831.) *David M.* concluded: "The record on appeal lacks any evidence of a specific, defined risk of harm to either David or A. resulting from mother's or father's mental illness, or mother's substance abuse. Certainly, it is possible to identify many possible harms that *could* come to pass. But without more evidence than was presented in this case, such harms are merely speculative. [Citation.]" (*Id.* at p. 830.)

In *James R.*, *supra*, 176 Cal.App.4th 129, the mother had been hospitalized for consuming alcohol and ibuprofen, had a history of suicide attempts, and had previously been treated for depression but had not complied with health care providers. (*Id.* at pp. 131-132.) When the jurisdiction hearing was held, the mother had been consistently participating in therapy and substance abuse treatment for three months. (*Id.* at p. 133.) The children were in school or daycare. (*Ibid.*) The social worker believed that the father did not understand the mother's mental health issues and he denied that she had a substance abuse problem. (*Id.* at p. 134.) The social worker also believed the children were safe in their father's care, but was concerned that he might leave the children in the mother's care. (*Ibid.*) *James R.* concluded that since "[t]here was no evidence of a specific, defined risk of harm to the minors resulting from [the mother's] mental illness or substance abuse, and no evidence [the father] did not or could not protect them," there was insufficient evidence to support the jurisdictional findings under section 300, subdivision (b). (*Id.* at p. 137.)

*David M.*, *supra*, 134 Cal.App.4th 822 and *James R.*, *supra*, 176 Cal.App.4th 129 are factually distinguishable from the present case. Here, the risk of serious physical harm to J. and X. was not speculative. Methamphetamine, cocaine, and drug

paraphernalia were found in the garage and in the mother's bedroom, and the drugs and drug paraphernalia were accessible to both children. Though the mother claimed that she was not selling drugs, packaging material, a digital scale, and a pay/owe sheet were found in her bedroom. The mother also minimized her drug use. Though claiming that she been using methamphetamine for the previous eight months, there was also evidence that she had been using the drug for the previous three years. She did not submit to drug testing during the month prior to the jurisdiction hearing. Moreover, there was evidence that the mother had neglected the children. She failed to obtain glasses with the correct prescription for J., the children ate cereal for lunch and dinner, and X.'s diaper was not changed unless R.M. was home. The mother also stated that she was hardly ever home. The juvenile court could reasonably conclude that this neglect was a result of the mother's drug use. There was no evidence at the time of the jurisdiction hearing that the mother was currently participating in treatment to address her substance abuse or that any changes had been made in the home environment. Thus, there was substantial evidence that the mother's substance abuse constituted a substantial risk that both children would suffer serious physical harm.

The mother next contends that there was insufficient evidence to support the dispositional order removing X. from her parental care.

Section 361, subdivision (c) provides in relevant part: "A dependent child may not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . : [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."

11

"' "' "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present circumstances." ' [Citation.]" (*In re Lana S.* (2012) 207 Cal.App.4th 94, 105.) We review a dispositional order under the substantial evidence standard. (*Ibid.*)

Here, the police had found drugs and drug paraphernalia that were accessible to the children in the home. The mother's current boyfriend was involved in selling drugs. Despite evidence of the mother's history of drug abuse and her own participation in selling drugs, the mother failed to drug test or have any contact with the Department for a month prior to the hearing. Thus, there was substantial evidence to support the juvenile court's finding that the mother's home created a substantial danger to the health and safety of three-year-old X. if he were returned to her care.

## III. Disposition

The orders are affirmed.

_____

Mihara, J.

WE CONCUR:

_____

Bamattre-Manoukian, Acting P. J.

_____

Grover, J.

13