Filed 11/16/20  In re Alicia G. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ALICIA G. et al., Persons Coming Under the Juvenile Court Law. | |
| | D077710 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ4498A-D) |
| v. | |
| AMBER M., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel, for Plaintiff and Respondent.

Amber M. (Mother) appeals from the juvenile court's disposition order removing her children. Mother argues substantial evidence does not support the children's removal. She also claims the court erred in failing to consider less drastic alternatives to removal. We find no error and affirm the disposition order.

FACTUAL AND PROCEDURAL BACKGROUND

In January 2020,[1] Mother had custody of 12-year-old Alicia G., nine-year-old E.A., three-year-old L.S., and seven-month-old Sophia S. (collectively, the children). Alicia's father is Jose G., a nonoffending noncustodial parent.[2] E.A.'s father is Fernando A., who was incarcerated for the duration of the case. The two youngest children share the same father, Lucas S. (Father). Mother and Father had been in a relationship for several years.

In mid-January, Mother, Father, and the four children were living in a Best Western hotel room. One day, Sheriff's officers were seeking to arrest a man with an outstanding felony warrant at the hotel; the man had been seen with Father by the family's room. Outside the room, officers observed Father exiting and walking away from Mother's car. He was holding marijuana.

---

[1]    Further unspecified dates occurred in 2020.

[2]    Mother is legally married to Jose, but they have not resided together or been in a relationship for years.

Inside the family's hotel room, about two pounds of marijuana was on a bedside table within arm's reach of Mother, toddler L.S., and infant Sophia.[3] Nearby, there was more marijuana, marijuana products contained in and out of vials, scissors, baggies, and containers with product pricing.[4] Officers found a small bindle of methamphetamine in Father's sock and a line of methamphetamine on the center console of Mother's vehicle. The powdery, white substance could be easily reached from the children's car seats. Multiple bindles of crystal methamphetamine were found in a box in the closet. A large wad of cash—$758—was found in Mother's wallet. Based on what they found, officers determined the drugs were possessed for sale. Father and Mother were arrested, and the children were taken into protective custody.

Mother initially disclaimed knowledge about any marijuana in the room. She said it was not there when she had gone to sleep, yet when she woke up, marijuana was on the table next to her. After being confronted with the evidence of drug sales, Mother "restated" that she was aware Father was in the business of selling marijuana. Mother, Father, and the children had been living in hotels for a few months, having been displaced from their apartment.

The Agency filed petitions on behalf of all four children, alleging they were at substantial risk of serious physical harm due to their parents' inability to adequately supervise or protect them. (Welf. & Inst. Code, § 300,

[3]    Alicia and E.A. were not in the hotel room when officers arrived. Based on the time of the incident, the older children were probably at school.

[4]    Some of the cannabis packaging was bright pink and covered with ice cream cones. It is not clear from the record whether this particular packaging or product was visible to or within reach of a child.

subd. (b).)[5] Specifically, the Agency alleged the children were not provided with a suitable home, they had access to narcotics and marijuana, they had been cared for by Father while he was under the influence of methamphetamine, and Mother was aware of Father's drug use.

The children were detained out-of-home. Alicia was placed with her father, Jose. Alicia usually spent her school breaks with Jose and his fiancée (Debbie), had a good relationship with them, and had her own room in their home. She was safe and comfortable there. The three younger children were placed in the home of Justice and Kristin S. (Uncle and Aunt), Father's brother and sister-in-law. The younger children were comfortable and well-fed in this home.

During the Agency's investigation, both Mother and Father were less than completely forthcoming, and they tried to minimize the risk to the children. Father ultimately admitted he was an unrelenting methamphetamine addict. He smoked methamphetamine daily and had been doing so for the past year. He was about to snort a line of methamphetamine in Mother's car right before officers arrived at the hotel. He constantly lied to conceal his addiction. He needed the "high" to maintain his illegal marijuana sales. He had most certainly been "high" from methamphetamine before while caring for the children though he always tried to appear coherent. He also smoked "weed." Mother knew Father had a drug problem—she had found compelling evidence of his use and they had fought about it several times—but he also denied her accusations and lied to her.

The younger children knew a great deal about drugs and criminal drug activities. Nine-year-old E.A., who suffers from cerebral palsy, reported that

_____

[5] Further unspecified statutory references are to the Welfare and Institutions Code.

4

Father would stay out all night, selling "stuff illegal," and Mother helped him with his business. E.A. described occasions when he had to watch L.S. and Sophia while Father went outside, smoking "weed" and "blunts." E.A. could identify weed and methamphetamine by sight and smell, having witnessed Father use these drugs outside and in the bathroom. Three-year-old L.S. reported that her father and his friends ("lots of friends") worked at her house with "weed," it "stinks," and Father would smoke it outside. The toddler reported that Father placed "weed" in her sister Alicia's makeup box, and Mother knew about it too. Alicia was unhappy that marijuana was in her makeup box.

When questioned, Mother did not believe E.A. had seen or smelled methamphetamine; she provided an innocuous story of what she believed had happened. Mother expressed shock that L.S. and Sophia tested presumptively positive for marijuana.

Twelve-year-old Alicia was protective of her mother. When questioned by the Agency, Alicia mostly denied any concerns about substance abuse but admitted she had seen marijuana in clear containers in the home. Alicia disclosed to Jose and Debbie that Mother "always fights" with Father about his use of drugs. Alicia had to babysit her younger siblings "all the time" and worried about what would happen to her siblings if she was not there. Alicia continuously suffered from lice in Mother's care. According to Jose, Mother also exposed Alicia to inappropriate subjects, such as selling cannabis products.

Mother and Father had a history of domestic violence, which the Agency learned from various interviews.[6] Mother mostly minimized the

---

[6]    Mother also experienced domestic violence in her prior relationships.

incidents, and Father completely denied them. Mother admitted there had been some past incidents where Father pushed or shoved her and one incident in front of the children where Father hit her in the head during a fight. Alicia reported Father hit her mother at least two separate times ("[i]t was scary") and him pulling Mother's hair during a fight. L.S. said that Father pulled Mother's hair before during another fight at a family member's house. Mother attempted to give the social worker an alternative, innocent explanation for L.S.'s report.

Alicia told paternal grandmother about an incident where Father threw Mother on the ground, causing Mother to suffer a horrific miscarriage. To the Agency, Mother denied being pushed. According to her, Father would not help her pick up a couch despite her asking for his help as they were trying to move out of their apartment in October 2019. Mother then picked up the couch by herself and suffered a severe, painful injury; later, she lost the baby along with a lot of blood. The children saw Mother as she was hemorrhaging.

Mother disclosed a highly traumatic childhood. Her parents were methamphetamine addicts who "hid" her until she was three years old. As a young child, Mother was forced to take care of her newborn baby sister because her own mother was incapacitated. Mother did not have enough to eat, and she witnessed severe domestic violence between her parents. As a teenager, Mother was beaten daily by her drunken father as he screamed bible verses. She finally ran away from home at the age of 16.

In February 2020, the court set the jurisdictional and dispositional issues for trial in April. The Agency's jurisdictional and dispositional report recommended removing the children from Mother's custody. In the Agency's assessment, Mother's traumatic childhood had negatively impacted how she approached relationships as an adult. She had a history of unstable

relationships and struggled to set protective boundaries for herself and the children.  Mother was unable to recognize the signs of drug use or she ignored obvious signs.  She had a limited support system.  Mother was only beginning to recognize her own shortcomings, stating:  "I have a lot [of] my own issues that I have to deal with right now.  Because I'm noticing how it's my fault and learning how to be ok with being alone. . . . I'm being [Father's] friend at this point.  So much has happened.  I don't know how much trust I have left.  As much as I do love him I don't know what I need to do.  I had such a bad upbringing, it lowered my expectations of what I was expecting in a relationship. . . ."

The Agency developed a case plan designed to help Mother consistently identify the signs of drug activity and substance abuse, develop and maintain healthy relationships, and obtain safe and stable housing.  She was required to participate in individual therapy, parenting classes, and weekly AA or NA meetings.  She also had discrete goals to complete.

The Agency documented its reasonable efforts to prevent or eliminate the need for removal, including efforts to refer the parents to voluntary services, providing housing information, and assisting them with transportation.  The social worker placed the children in appropriate care, provided services, and arranged visitation.

In March, the hearing dates were continued due to the juvenile court's closure caused by the COVID-19 pandemic.  The new pretrial status conference and trial were set in June and July, respectively.  The Agency submitted addendum reports in March, April, June, and July, providing status updates on the parents and children.

In March, Mother was beginning her services, parenting classes, and NA meetings.[7] She moved into a suitable two bedroom apartment. Father was fairly complying with drug court, attending NA/AA meetings, and visiting the children.

In April, Mother disclosed that Father had moved back in with her. Due to the COVID-19 pandemic, he was having a difficult time finding a sober living home. Father was evasive, telling the Agency "he was currently living with a friend." He missed a drug test requested by the Agency due to a claimed work conflict. Father was also not drug testing through drug court or any sober living facility.

By May, Father moved out of Mother's apartment. She decided to separate from him for the time being, stating, "it's not that I don't love him, but at this point in my life I cannot trust him." The parents remained in contact and attended supervised visits with the children together.

Mother was continuing her participation in services. Due to the pandemic, she had been attending NA meetings online, but "wasn't getting much from them." In June, in-person meetings resumed, and Mother stated that having the in-person support was helping to keep her motivated. As of mid-June, Mother had not yet begun her co-parenting classes.

Father's progress in services deteriorated. His participation in substance abuse treatment was unsatisfactory. He missed certain drug tests in April, May, and June, and by the end of June, was in "poor" compliance in drug court due to missed sessions. Uncle expressed concerns that Father was using drugs again. The Agency reminded Father that it considered a missed drug test to be a positive result.

---

[7] In the mid-to-late March timeframe, Mother's services transitioned to a telephonic or virtual setting because of the global pandemic.

In the Agency's last addendum reports, it reiterated its safety and risk concerns noted in the jurisdiction and disposition report and continued to recommend the children's removal from Mother. Although Mother was making progress in her services, the Agency was concerned about her unstable and codependent relationship with Father. They had lived together again in March and ended the relationship (again) in May. Mother was transporting Father to visits in June despite other family members' concerns about his sobriety, and she still professed love for him. In the Agency's opinion, the children were not safe in Mother's custody until she could maintain stability and demonstrate appropriate boundaries. However, the Agency believed Mother was ready to begin short, structured unsupervised visits with the children. During or after each of these visits, relatives had agreed they could check in on Mother and report any concerns to the Agency. Also, for example, Mother might be able to take Alicia out to eat for an hour or two and return her to a previously agreed-upon relative's home.

The Agency further recommended (1) Alicia's placement with Jose, granting Jose custody, and terminating jurisdiction as to Alicia; and (2) the three younger children's continued placement with Uncle and Aunt. All the children were doing very well in their placements. Jose had been caring for Alicia without any concerns, he was protective of his daughter, and he could be trusted to work with Mother on conditions of unsupervised visits. The younger children were thriving in the care of Uncle and Aunt.

On July 1, trial proceeded on the contested jurisdictional and dispositional issues. The court received in evidence the Agency's reports and a packet of Mother's documents that supported her progress in services. There was no live testimony. After hearing the arguments of counsel, the court made true findings on the petitions by clear and convincing evidence.

9

As to disposition, the court likewise found by clear and convincing evidence that the children should be removed from Mother under section 361, subdivision (c), in that there was or would be a substantial danger to their physical health, safety, protection, or physical or emotional well-being if they were returned home, and there were no reasonable means by which the children's physical health could be protected without removal. The court ordered placements and visitation consistent with Agency recommendations, reunification services as to the younger three children, and terminated its jurisdiction as to Alicia.

Mother's appeal followed.

### DISCUSSION

Mother argues that substantial evidence does not support the juvenile court's disposition of removal. She also argues the court erred in failing to consider less drastic alternatives to removal. The Agency responds that substantial evidence supports removal under section 361, subdivision (c)(1). Further, the Agency points out that the juvenile court expressly stated at the disposition hearing that it had considered whether the children could be safely returned to Mother. We find merit in the Agency's position.

Mother concedes the court's jurisdiction over the children under section 300, subdivision (b). After a juvenile court finds a child to be within its jurisdiction, the court must decide where the child will live while under the court's supervision, i.e., disposition. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 105.)

Under section 361, subdivision (c)(1), a dependent child may not be taken from the physical custody of his or her parents "unless the juvenile court finds clear and convincing evidence . . . [¶] . . . [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or

10

emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor" from the parent's physical custody.

Evidence of a "substantial risk of serious physical harm" to a minor for purposes of jurisdiction (§ 300, subd. (b)) likewise supports a finding of a "substantial danger to the physical health" of the minor for purposes of removal (§ 361, subd. (c)(1)). (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 825-826 (*Rocco M.*).) Creating a home environment where a child has the means, opportunity, and a potential motive to abuse drugs substantially endangers the child's physical health. (*Rocco M.*, at pp. 825-826 [proper removal of 11-year-old boy from mother's custody]; see *In re R.T.* (2017) 3 Cal.5th 622, 629 [discussing *Rocco M.*].)

A " 'parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present circumstances." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170.)

" 'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*In re R.T.*, *supra*, 3 Cal.5th at p. 633.) When presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, a reviewing court "must determine whether the record, viewed as a whole, contains substantial

evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

The Agency detained the children because Mother and Father created a patently dangerous home environment. Drugs were present and accessible to the children in the home, and the parents were engaged in illegal drug sales. The infant and toddler were far too young to protect themselves from dangers associated with drugs and criminal drug activity, and they were often cared for inappropriately, solely by another child or their father while he was under the influence of methamphetamine. As for the two older children, they were "placed in an environment allowing access to drugs, with nothing to prevent [them] from succumbing to the temptation to ingest them." (*Rocco M.*, *supra*, 1 Cal.App.4th at p. 825.) Alicia and E.A. were frequently left to fend for themselves and had, troublingly, normalized their parents' drug activities. Mother was naïve and unaware about her children's access to drugs, or, she knew about the dangers and was unconcerned. The children were not safe with her.

Compounding or contributing to the dangerous home environment was the parents' violent and codependent relationship. Mother tolerated mistreatment and abuse. She failed to stop Father's illegal drug sales, and in fact, assisted him. Viewing evidence in the light most favorable to the juvenile court's findings, Mother was an active participant in Father's criminal activities. She was found in a hotel room surrounded by drugs, with cash proceeds in her wallet. She admitted knowing about his marijuana sales. Even the children knew what Father was doing. Additionally, Mother overlooked Father's methamphetamine addiction for an extended period of

12

time, allowing him to care for the children while he was "high." She did not know how to set appropriate protective boundaries.

Mother apparently does not dispute that the children were in substantial danger in her care at one point in time but argues that by the time of the disposition hearing, she had taken responsibility for her actions and steps to prevent future mistakes.

Although Mother was beginning to understand the protective issues by the time of the July disposition hearing, substantial evidence supports the juvenile court's finding of a "substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the children if they were returned home. (§ 361, subd. (c)(1).) The protective issues in this case were clearly capable of recurring. Father was continuing to abuse drugs. After the children were detained, Mother minimized her awareness of Father's conduct, downplayed the incidents of domestic violence, and dismissed her children's shocking (and truthful) statements. Her conduct was not consistent with that of a protective parent. Whether intentionally or unwittingly, Mother made excuses for Father. As recently as May, the parents were still in a relationship, and in June, she was still helping him with rides. She still loved him. Mother's unstable and unhealthy relationship with Father contributed to a detrimental home environment. She was in an early stage of understanding this.

Mother asserts the court did not consider less drastic alternatives to removal. For example, she suggests the children could have been returned to her care under stringent conditions of supervision. (See, e.g., *In re A.E.* (2014) 228 Cal.App.4th 820, 827 [involving one occasion of excessive discipline with a belt]; *In re Jeanette S.* (1979) 94 Cal.App.3d 52, 60-61 [reasonable alternatives to removal in the case of a dirty home].)

13

Contrary to Mother's assertion, the juvenile court considered whether there was any way the children could be returned to Mother's care, stating: "[T]here is clear and convincing evidence that the children should be removed. And the [c]ourt did struggle with this prior to today. I did read very carefully the reports here in part because [Mother] has been working so hard. [¶] So, of course, any time children are removed it is a decision that shouldn't be made lightly. *If there's any way for the children to be safely returned to their mother, then that's what should happen.* And unfortunately in this case I just don't believe the children will be safe yet." (Italics added.)

Accordingly, the juvenile court considered reasonable means to prevent removal. It carefully considered whether there was "any way" the children could be safely returned to Mother. Ultimately, the court determined there were no reasonable alternatives.[8]

Substantial evidence supports the court's finding that there were no reasonable alternatives to removal. As we have discussed, Mother was complicit with Father in creating an unsafe home environment, and, she was recently still involved with him. The court could reasonably find that she could not yet be trusted to protect the children from him in her home. However, in light of Mother's progress, the court authorized short, structured unsupervised visits. Based on the totality of the evidence, the juvenile court reasonably found that Mother's conduct posed a substantial continuing risk

---

[8] To the extent Mother claims the court should have made more specific findings regarding reasonable alternatives, the claimed deficiency is forfeited. Any deficiency in the Agency's reports or the juvenile court's findings regarding removal or reasonable alternatives to removal could have readily been cured by an objection from Mother. She did not ask for clarification or greater specificity. (*In re E.A.* (2012) 209 Cal.App.4th 787, 791 [purported failure to make an express finding is the sort of "alleged defect that could have been easily cured, if raised in a timely fashion"].)

of harm to the children and that such risk could only be obviated by removing them from her custody.

## DISPOSITION

The disposition order is affirmed.


O'ROURKE, J.

WE CONCUR:



BENKE, Acting P.J.



DATO, J.